COMMONWEALTH *vs.* JAMES BALAKIN, JR.
(and two companion cases [1]).

Middlesex.   November 3, 1969. — December 29, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Practice, Criminal,* Appeal, Argument by prosecutor, Fair trial, News-
paper article. *Accessory. Confining for Purpose of Stealing. Evi-
dence,* Admissions and confessions, Consciousness of guilt.

If comment by the prosecutor in his closing argument at a criminal trial
constituted improper criticism of objections made and exceptions saved
by counsel for the defendants, they were not prejudiced in view of
instructions by the judge that the argument was not evidence and
that the jury were not to draw any inference from the objections and
exceptions. [550–551]

At the trial of indictments stemming from an attempted bank robbery,
comment by the prosecutor in his closing argument that in other cir-
cumstances several of the defendants "would have remained petty
criminals: stealing automobiles, breaking into stores" did not require
allowance of a motion for a mistrial where the judge promptly stated
that "We are not going into" such matters and later instructed the
jury that argument was not evidence and that the jury must make
their determinations "only upon evidence." [551–552]

On the record, there was no prejudice at a criminal trial where the judge
declined to correct an inaccurate statement in the prosecutor's closing
argument and left the matter to the collective memory of the jury.
[552–553]

Evidence at a criminal trial of activities of the defendants and occur-
rences before and after an attempted bank robbery and evidence that
during the attempted robbery the bank's manager was compelled at
gun point to move from her office, where there was a burglar alarm, to
a place in the lobby of the bank where she remained for fear of being
shot until the police arrived warranted findings that one of the de-
fendants was guilty of being a principal in the commission of the crime
of confining for the purpose of stealing and that two other defendants
were guilty of being accessories before the fact to that crime. [553–
554]

At the trial of indictments arising from an attempted bank robbery, there
was no error in denial of a motion for a mistrial based on a newspaper
article published on the first day of the trial and stating that one of
two persons not on trial had been sentenced on charges "in connec-

---

[1] Commonwealth *vs.* Vincent J. Kebarian;   Commonwealth *vs.* Robert
Dussault.

tion with" the attempted robbery and that the other person had
pleaded guilty to charges "stemming from" it, where the judge in-
structed the jury to disregard anything they had heard about the case
and to consider only what they heard in the court room, and much
related in the article was the subject of testimony at the trial. [554]
Testimony at a criminal trial as to threats made by the defendant to the
witness shortly before the trial could be considered by the jury to be
an admission of guilt in view of other very strong evidence of guilt.
[554–555]

INDICTMENTS found and returned in the Superior Court
on November 7, 1967.

The cases were tried before *Beaudreau*, J.

*Reuben Goodman* for the defendants.

*Francis K. Monarski*, Assistant District Attorney, for the
Commonwealth.

CUTTER, J. Balakin and Robert Dussault were found
guilty on indictments charging them with being accessories
before the fact to confining for purposes of stealing from
a bank. Kebarian was found guilty of being a principal
in the commission of the crime. A fourth defendant,
Donald L. Stout, was also found guilty of being an ac-
cessory. His case has already been heard on appeal. *Com-
monwealth* v. *Stout, ante*, 237.

The cases are before us under G. L. c. 278, §§ 33A–33G.
The evidence permitted the jury to find the facts described
below.

On September 14, 1967, the Lowell police, because of
information brought to their attention, kept the Lowell
Institution for Savings (the Institution) under observation.
They looked into the bank and saw Kebarian in the tellers'
area. They entered the bank and arrested Kebarian and
James Hunt, who was also in the bank. Paul Dussault, who
was in an automobile outside, was taken into custody at the
same time.

Kebarian and Hunt, each with a gun in his hand, had
entered the bank about 9:15 A.M. and said, "This is a
stickup." Kebarian approached the bank manager, Mrs.
Constantine, with a gun in his hand. She was at her desk
in a separate office across the lobby from the tellers' area.

He asked her whether she had pulled the alarm. She said that she had not done so. Kebarian, whose gun was pointed at her head, directed her to move from her desk into the bank lobby. She did so because she was in fear. When in the lobby, she did not move from a spot near the number one teller's cage because she "didn't want to get shot." Kebarian jumped over the counter and started to open one of the tellers' drawers. The police then entered.

Paul Dussault, brother of Robert, pleaded guilty to offences connected with the Institution holdup project. He gave testimony concerning meetings in Robert's apartment on September 5 and again on September 12 and in his own apartment, when two meetings were held. At the September 5 meeting, the robbery of three banks was discussed. At the later meeting on September 12 the two Dussaults, Hunt, Kebarian, and John Crow were present. Later that day Balakin drove the two Dussaults and Kebarian around Lowell to look over a branch of the Middlesex County National Bank as a prospective holdup victim. There was conversation about the possibility of robbing this bank and the Institution on the same day.

On September 13, the Dussaults, Kebarian, and Hunt discussed the Institution robbery project; Balakin was not present. That evening Balakin called Robert Dussault's apartment and was told by Paul Dussault, who was there, that Robert wanted to see him at the Sac Club "relative to a car." Later Paul observed two automobiles drive up in front of Robert's house. Balakin stepped out of one automobile, a Cadillac, and drove away in the other vehicle. Balakin again called Paul by telephone a few minutes later. Paul told him that the Cadillac could not be left where it was. Balakin returned in another automobile and, following Balakin's lead, Paul drove the Cadillac to a hiding place. Balakin gave Paul two pairs of brown cloth gloves to use in avoiding fingerprints and told Paul to tell his brother Robert, that the Cadillac "is $200 and $200 goes off the top," which meant the expected proceeds of the planned robbery.

On the morning of September 14, 1967, Crow disappeared. Robert Dussault made checks in the area of the Institution and gave word by telephone to go ahead. On the night of the 13th, it had been definitely planned to rob the Middlesex County National Bank. The Institution project "was up in the air." On the 14th, Robert Dussault decided to make the Institution the "target for the day."

On the morning of the 14th, Balakin came to Paul Dussault's apartment and asked if the group had come back yet. He was told that they had not returned. He came to Robert's apartment that afternoon.

On September 5, 1967, when a bank robbery was being discussed, Balakin provided Robert Dussault, at the latter's place, with two guns for a robbery planned for the 6th. Stout was present. Balakin demanded $25 rental for each gun. Robert Dussault agreed to this. The project for the 6th was called off because too many police were around. The guns were retained until the 14th.[2]

On November 7, at Balakin's request, Christopher Dussault, another brother of Robert, collected from Robert's wife a diamond ring and gave it to Balakin for use in obtaining bail for Robert Dussault. On that day Balakin and Stout warned Christopher to leave town because Paul Dussault was "talking." Other pertinent testimony is stated in connection with the discussion of specific assignments of error.

1. In his closing argument, the prosecuting attorney made comments about the numerous objections made by defence counsel during the prosecutor's questioning of Paul Dussault and Christopher Dussault about their motive in testifying. He quoted Paul as saying that the defendants threatened "to kill my sister and her children." He continued, "If you recall, all four lawyers were up

---

[2] There was evidence, which the jury, of course, did not have to believe, that these guns were not the ones used on September 14. There was also evidence that two other guns were delivered to Paul Dussault's apartment on September 12 by Robert Dussault, who was observed receiving them in front of the apartment from Stout. See *Commonwealth* v. *Stout, ante,* 237, 239.

on their feet screaming at that time. Well, if we are really looking for the truth as to what motivated Paul to testify, aren't you entitled to know that?" Christopher was quoted as saying that the fear that the defendants "planned to kill Paul Dussault, my brother" led him to testify.

If interpreted as criticism of the making of objections and the saving of exceptions by counsel, the argument was improper. See *Commonwealth* v. *Coughlin,* 182 Mass. 558, 562–564. See also *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 229. It also made somewhat inaccurate references to the circumstances. There was, however, no objection and exception when this argument was made. In the absence of an exception nothing is before us on review. *Commonwealth* v. *Myers, ante,* 343, 346. In any event, the judge later charged that arguments were not evidence and that objections and exceptions by counsel were not to form the basis of any jury inference. There was no such significant possibility of prejudice as was considered in *Commonwealth* v. *Freeman,* 352 Mass. 556, 563–564.

2. In argument, the assistant district attorney suggested that some of the defendants, including Robert Dussault especially, were far more reprehensible than others. He said, "[I]n the absence of the masterminding plan by Robert Dussault and in the absence of the guns and bullets [furnished] by . . . Stout, it would appear . . . that Paul Dussault, Kebarian, and Hunt would have remained petty criminals: stealing automobiles, breaking into stores."[3] Upon objection by Kebarian's attorney, the judge promptly said, "We are not going into breaking in stores" or "stealing automobiles." He denied a mistrial, subject to Kebarian's exception. Kebarian had not taken the stand, so no past record had been introduced to impeach his credibility. Cf. *Commonwealth* v. *Stone,* 321 Mass. 471, 472–474 (evidence

---

[3] There was some basis for charging past misconduct to Paul and Christopher. There had been admissions by Paul Dussault that he had made pleas of guilty to the Institution charges and to other unrelated offences. There was also testimony that Kebarian had rented an apartment in a false name and that Robert, Paul, and Christopher had stolen an automobile in September.

of specific prior impropriety wrongly admitted). Cf. also *Commonwealth* v. *Crehan*, 345 Mass. 609, 610–612 (news account of specific criminal records); *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (judge hearing a criminal case without a jury actually improperly received evidence of prior offences of the same type as that involved in the case then before the court); *Commonwealth* v. *Nassar*, 351 Mass. 37, 45 (evidence of admissions of prior offence of same type improperly received). The argument, while improper, did not go so far as to charge Kebarian or any other defendant with having any specific criminal record, although it might have been misunderstood as doing so.

As has been noted, the judge promptly cut short the line of argument and later charged that arguments were not evidence, that the jury must rely on their "collective memory . . . of the evidence," and that guilt is to be determined "only upon evidence." The judge was not asked to expand his instructions on the point. See *Commonwealth* v. *Cabot*, 241 Mass. 131, 146–151. See also *Commonwealth* v. *Ladetto*, 349 Mass. 237, 248; *Commonwealth* v. *Belton*, 352 Mass. 263, 269–270. We think that the judge adequately dealt with the situation in the circumstances.

3. In his argument, the assistant district attorney stated that there had been testimony that should the police chase the robbers, Paul Dussault was "under orders from Robert . . . to slow . . . the getaway car so that Hunt and Kebarian . . . could shoot it out with the police." The testimony in fact was that Kebarian and Hunt gave these instructions. There had been other testimony that, on September 6, Robert Dussault had expressed a desire to shoot it out with police found around the bank that day. This may have led to confusion concerning the person giving the instructions. The testimony also permitted the inference that whoever had given instructions about shooting had done so when Robert Dussault was present. The judge declined to correct the assistant district attorney and left this matter to the collective memory of the jury. We see no

prejudice, since the evidence clearly permitted the jury to conclude that Robert Dussault was willing to use guns.

4. The assistant district attorney, as has been indicated, exceeded proper limits in portions of his argument.[4] Where, however, appropriate objection was made, the judge sufficiently and promptly corrected any significant improper statements. We see no basis for concluding that the argument as a whole was prejudicial.

5. There was no error in denying the defendants' motions for directed verdicts. They were caught in the midst of carrying out the attempted holdup. The evidence against them was sufficient and strong. Nevertheless, we consider respects in which it is now contended that verdicts should have been directed.

(a) There was ample evidence, already summarized, that Mrs. Constantine was confined for the purpose of stealing from a bank. The jury reasonably could have concluded that she, by threats and force, was removed at gunpoint from a burglar alarm in her own office and restricted (until the police arrived) to a fixed area in the lobby. This constitutes confinement which satisfies G. L. c. 265, § 21.

(b) Balakin's connection with the robbery on September 14, 1967, was sufficiently close to warrant his conviction as an accessory. The robbery attempted on the 14th was essentially the same project at least temporarily abandoned on September 6 because of the unexpected presence of police. In planning that venture, Balakin participated and provided guns. He provided an automobile on September 12 to investigate the possible target banks. He provided a Cadillac used in the attempted robbery on the 14th. He came around promptly after the time at which the attempt was made to inquire about the perpetrators. The jury could reasonably infer that the project was continuous from September 5 until the Institution holdup and that

---

[4] For this impropriety he was admonished in *Commonwealth* v. *Stout, ante,* 237, 244. Even in a case where the evidence against the defendants is as strong as in that before us, conduct of this type is seriously reprehensible and unnecessarily adds to the difficulties of proper law enforcement.

Balakin knew about it and participated in it. His knowledge of the investigation of two possible target banks on the 12th, and of the suggestion that both banks be robbed on the same day an hour apart, permitted the inference that he was not merely a participant in a proposal to rob one particular bank, but was helping the other participants to effect a robbery of whichever bank appeared on the day selected to be the better target of opportunity.

6. A Lowell newspaper published an article on February 14, 1968, the first day of trial, stating that Hunt had been sentenced on charges "in connection with the attempted bank holdup in Lowell" and that Paul Dussault had pleaded guilty to "charges stemming from the attempted bank stickup." The jury were not locked up during the trial. When the article was brought to the attention of the trial judge, he gave careful instructions to the jury to disregard anything they had heard about the case and to consider only what they had heard in the court room. The jury were not individually asked whether any of them had read the article. Much related in the article, however, was the subject of actual testimony before the court, which was not the situation in *Commonwealth* v. *Crehan*, 345 Mass. 609, 614 (where the news article made specific reference to criminal convictions not in evidence). Although defence counsel saved exceptions to the denial of a mistrial, they did not ask amplification of the explicit additional instructions given by the trial judge concerning their obligation to rely only on evidence before them. The jury, of course, heard direct testimony concerning Hunt's participation. Paul Dussault himself had testified before them, without objection, that he had pleaded guilty. We think that the judge's instructions afforded ample direction concerning the jury's duties and avoided dangers of misunderstanding which might have arisen from more specific references to the news article. See *Taylor* v. *Creeley*, 257 Mass. 21, 26. Cf. *Commonwealth* v. *Giacomazza*, 311 Mass. 456, 466; *Commonwealth* v. *Sousa*, 350 Mass. 591, 595.

7. There was no error in admitting testimony by Christo-

pher Dussault of threats to him made by his brother about two weeks before the trial. Taken with the other very strong evidence of guilt this testimony could be viewed by the jury as in some degree an admission of guilt. *Commonwealth* v. *Smith*, 162 Mass. 508, 509–510. See *Minihan* v. *Boston Elev. Ry.* 205 Mass. 402, 405; Wigmore, Evidence (3d ed.) §§ 277–278. Cf. *Commonwealth* v. *Fancy*, 349 Mass. 196, 201, where alleged implied admissions showing consciousness of guilt were equivocal and were unsupported by other evidence.

*Judgments affirmed.*