COMMONWEALTH *vs.* RICHARD E. VALLIERE.

Hampden.     September 16, 1974. — December 11, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & WILKINS, JJ.

*Homicide. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights.· *Waiver. Evidence,* Admissions and confessions, Witness's notes, Corroborative evidence, Judicial discretion, Demonstration. *Jury and Jurors. Practice, Criminal,* Examination of jurors, Charge to jury, Argument by counsel, Admonition of counsel by judge. *Identification.*

The reading of an inquest transcript and report by a judge who thereafter presided at a jury trial for murder did not prejudice the defendant's

right to a fair trial where there was no indication that the judge improperly relied on the inquest transcript or report in ruling on issues arising before or at the trial. [483]

At the trial of indictments for murder and armed robbery, it was not error for the trial judge to deny a motion by the defendant to suppress information given on several occasions by the defendant to police officers freely and voluntarily while he was not in custody where on such occasions the defendant was informed of his rights and knowingly and intelligently waived them. [483-487]

At the trial of indictments for murder and armed robbery, it was not error to admit evidence of equivocal statements by the defendant as to his whereabouts at the time of the robbery [488-489]; to admit testimony by a salesman, who sold the defendant a car the day of the robbery and was tipped five dollars by the defendant, that he had never received tips before [489]; to admit evidence of an unsuccessful police investigation of a place on a river where the defendant said he had dropped a rifle in parts [489-490]; to limit, with the defendant's acquiescence, the reading in evidence of a detective's notes to those portions compiled by him [490]; to limit in certain respects the defendant's cross-examination of witnesses in matters pertaining to the identification of the defendant's car [490-492]; to exclude testimony as to why a detective had interfered with a conversation between defense counsel and a witness for the Commonwealth [492]; to limit certain testimony relating to the condition of the defendant's car and the extent of the defendant's cash holdings [492-493]; or to deny a demonstration designed to show improbability of identification of the defendant by a witness [493].

At the trial of indictments for murder and armed robbery, certain alleged criticisms of defense counsel by the trial judge were not prejudicial. [493-494]

At the trial of indictments for murder and armed robbery, it was not error for the trial judge to instruct defense counsel not to comment on the death penalty in his argument to the jury otherwise than by asking for a recommendation that it not be imposed, nor was it a miscarriage of justice for the prosecution to comment on the defendant's reading transcripts and suggesting questions to defense counsel where such comment suggested the defendant's coolness under stress. [494-495]

There was no merit in a contention by the defendant in a murder and armed robbery case that the trial judge coerced a verdict from the jury in violation of G. L. c. 234, § 34. [495-496]

At the trial of indictments for murder and armed robbery, there was no error in charging the jury in the language of the charge in *Commonwealth* v. *Tuey*, 8 Cush. 1, omitting a portion of that charge on reasonable doubt, as to which the judge in the present case had already charged. [496-497]

It was not an abuse of discretion for the judge at a murder and armed
  robbery trial to refuse to permit the defendant to poll the jury after
  verdict. [497]
Under *Furman* v. *Georgia,* 408 U. S. 238, judgments imposing the death
  sentence in murder cases must be reversed and the cases remanded
  for resentencing the defendant to life imprisonment. [497]

INDICTMENTS found and returned in the Superior Court
on September 22, 1971.

Pre-trial motions were heard by *Tisdale,* J., and the cases
were tried before him.

*Efrem A. Gordon* for the defendant.

*John T. McDonough,* Assistant District Attorney, for the
Commonwealth.

BRAUCHER, J. The defendant appeals under G. L.
c. 278, §§ 33A-33G, from convictions of the murder of two
employees of a bank in Chicopee and of armed robbery,
while masked and disguised, of the same two employees.
The events in controversy took place on January 11, 1971.
Pre-trial hearings were held on eleven days in March and
April, 1972, and the jury trial took thirty-one days in May
and June, 1972. More than 6,000 pages of transcript are
before us, disclosing more than 200 exceptions taken by the
defendant. He has filed thirty assignments of error, and
argues most of them under twenty-one separate headings.
We affirm the convictions, but reverse the judgments in so
far as they impose death sentences and remand for resen-
tencing to imprisonment for life. *Commonwealth* v. *Le-
Blanc,* 364 Mass. 1, 14-15 (1973).

We summarize very briefly the evidence supporting the
convictions, omitting statements by the defendant. About
2:40 P.M. on Monday, January 11, 1971, a man entered a
branch of the Springfield Institution for Savings located in
a trailer in a large shopping center in Chicopee. A camera in
the bank took pictures every fifteen seconds; they showed
the man clad in a jacket with a hood and holding a rifle, but
he could not be identified from the pictures. The only other
people who were then in the branch were two bank
employees. One of them activated an alarm. Both employ-

ees were shot and killed while lying face down on the floor, and $4,655.16 was taken. The police arrived within five to ten minutes.

Several witnesses saw the robber in the vicinity of the bank shortly before or after the crimes, but their descriptions varied and none could identify the defendant as the man seen. One witness, Shelton, identified the robber as a man who was driving a green 1960 or 1961 Mercury Comet with Massachusetts license plate 8, blank, blank, 51L. A day or two after the crimes he added another digit to make it 86, blank, 51L. The defendant sold a green 1960 Mercury Comet, license 86051L, in Worcester, late in the afternoon of the crimes. When the car was located on January 18, 1971, the same witness identified it as the car he had seen.

There was expert testimony that the bullets recovered from the scene of the crimes were fired from an Italian 7.35 calibre Mannlicher Carcano rifle. The defendant owned such a rifle, but it was not found. The defendant also owned a hooded jacket similar to that worn by the robber, but it was not found. In the defendant's home the police found a pair of construction boots like those mentioned in some of the descriptions of the robber.

On January 5, 1971, there was a $2.62 balance in a joint account of the defendant and his wife in a Springfield bank. On January 9, 1971, the defendant did not have enough money to make a customary $1 bet at a bowling alley. On January 11, 1971, about twenty minutes after the crimes, he made a $300 drive-in deposit at the Springfield bank. Later that afternoon he paid $295 in cash, when he traded in the 1960 Mercury for a 1965 Chevrolet automobile in Worcester. Change of $5 was due him, but the office where change was available was three miles away, and he told the salesman to keep the change. Later that evening, back in Springfield, he paid in cash a debt of $430, and he gave his wife about $55. Three or four days later he had fifty and hundred dollar bills in his wallet.

An inquest was held in May, 1971, and a grand jury returned four indictments against the defendant on September 13, 1971. He was arrested on September 23, 1971, on

an indictment warrant. The jury verdicts were returned June 21, 1972, and he was sentenced the same day. His motion for a new trial was denied November 14, 1972.

1. *The inquest report.* On March 23, 1972, in the course of a hearing on a defense motion for a continuance, the judge said that the inquest transcript and inquest report were available to counsel for the defendant, and added, "I have one in my lobby which I just got through reading." Thereafter the defendant moved for a change of venue, for a rehearing of his motion to suppress (considered below), and for disqualification of the judge, on the ground that the judge had read and become familiar with the transcript and report of the inquest. Each motion was denied, and the defendant assigns as error that his right to a fair trial was prejudiced by the reading. "The appearance of judicial detachment," the defendant says, "has certainly been destroyed by the trial Court's curious absorption of extra-judicial material."

We agree with the defendant that inquests are not part of any criminal proceedings which may ensue, and that although some evidence at an inquest may be admissible at later criminal proceedings, in accordance with usual principles of the law of evidence, the inquest decision itself is not admissible. See *Kennedy* v. *Justices of the Dist. Court of Dukes County,* 356 Mass. 367, 374 (1969). It does not follow, however, that a judge who has read the inquest report is disqualified from acting in the criminal case, where the case is tried before a jury. Judges acting on pretrial motions are often exposed to evidence not admissible at trial, and judges must often hear inadmissible evidence in order to rule that it is inadmissible. As to jury waived trials, see *Commonwealth* v. *Brown,* 364 Mass. 471, 480, fn. 20 (1973). There is no indication that the judge improperly relied on the inquest transcript or report in ruling on issues arising before or at the trial. The assignment of error is not well taken. Cf. the *Kennedy* case, *supra,* at 379; *Commonwealth* v. *Leventhal,* 364 Mass. 718, 721-722 (1974).

2. *The motion to suppress.* The defendant moved be-

fore trial that any statements by him which the Commonwealth intended to use as evidence be suppressed because he was not properly warned of his constitutional rights before making the statements. Extensive testimony was given at the nine-day hearing on the motion by nine police officers, the defendant and several others. The judge filed twenty-three pages of findings with respect to claimed "violation of defendant's *Miranda* rights." See *Miranda* v. *Arizona,* 384 U. S. 436 (1966). He denied the motion, and the defendant claims error.

We summarize the judge's findings. On January 12, 1971, the day after the crimes, policemen visited the defendant's home in Springfield, saw in the yard a Chevrolet bearing the numbers they were looking for, and were told by the defendant's wife that a Mercury had been traded in when the Chevrolet had been purchased. On January 18, 1971, police officers again went to the defendant's home, and thereafter he made statements on five separate occasions on January 18 and 19. The judge made separate findings as to each.

(1) Four police officers arrived at the defendant's home about 6 or 6:30 P.M. on January 18, 1971. They were conducting a general inquiry or investigation into unsolved crimes, and suspicion began to focus on the defendant only after they learned from a bill of sale that the defendant had traded in his Mercury for the Chevrolet in Worcester on January 11, 1971, and learned from the defendant that the transaction was consummated "about dark." One of the officers immediately read *Miranda* warnings to the defendant from a card, and the defendant understood his rights and knowingly and intelligently waived them. He was not in custody or otherwise deprived of freedom of action in any way, but freely accompanied the officers to the Chicopee police station.

(2) Two of the officers questioned the defendant at the station about 8:15 P.M. on January 18. They did not give him *Miranda* warnings, but had been present when such warnings were read to him less than two hours before. His previous waiver carried over, he was not in custody or

otherwise deprived of his freedom in any significant way, and the information given by him was given freely and voluntarily.

(3) About 10:30 P.M. on January 18 the defendant was questioned at the station by the chief detective, who first read *Miranda* warnings from a card. The defendant understood his rights and knowingly and intelligently waived them before any questioning began. He was not in custody or otherwise restrained in doing anything he desired, and the information given by him was given freely and voluntarily.

(4) About 12:20 A.M. on January 19 another officer told the defendant that he had just returned from Worcester, that the defendant's Mercury had been absolutely identified as the car seen at the scene of the crimes, and that the defendant was the chief suspect. The officer then read *Miranda* warnings from a card, and the defendant understood his rights and knowingly and intelligently waived them before any questioning began. The defendant was not in custody or otherwise restrained, gave information freely and voluntarily, and was taken home about 1 A.M.

(5) About 1:30 P.M. on January 19 two officers went to the defendant's home. They gave him *Miranda* warnings before any questioning, and he understood his rights and intelligently and knowingly waived them. After conversation with the defendant and his wife for about an hour, he went to the police station with them and indicated that he was willing to go with them to Brattleboro, Vermont. He went with them to Brattleboro, and pointed out a place where he said he had dropped a rifle in three pieces from a bridge onto the river. The river was frozen, and a search was made for the rifle parts, but they were not found. A telephone call was made to Chicopee about 5 P.M. An attorney tried to reach the defendant at the Chicopee police station shortly after 5 P.M., and the defendant was put in contact with the attorney by the police as soon as it was possible to do so, on his return that evening. He was then driven home. He was not in custody or limited in his action to any significant degree during the period before, during,

and after the Brattleboro trip, and the information given by him was freely and voluntarily given.

The defendant attacks several of these findings, relying in part on evidence which was apparently not believed by the judge. He asserts that the investigation had definitely focused on him before the police went to his home on January 18. Treating the knowledge of one police officer as the knowledge of all, he argues that the composite knowledge of the police created probable cause to arrest him before he disclosed the date and place he sold his Mercury. He further argues that his liberty was restrained when four police officers were in his kitchen with him and his wife. Even after *Miranda* warnings were given, he says, there was no waiver of rights by him. He also attacks the sufficiency of the warnings given, and he claims that the bulk of the Commonwealth's evidence at the trial, including the ballistics evidence as well as the identification of the car, was the fruit of improper interrogation.

"We cannot properly be asked to revise a judge's subsidiary findings of fact, where they are warranted by the evidence, or to review the weight of the evidence related to the findings." *Commonwealth* v. *Murphy,* 362 Mass. 542, 550 (1972) (concurring opinion of Hennessey, J.). We think the judge's findings were warranted by the evidence before him. As to the initial interrogation, the case closely resembles *United States* v. *Hall,* 421 F. 2d 540, 545-546 (2d Cir. 1969), cert. den. 397 U. S. 990 (1970). Here, as there, it is "altogether too easy to fall into the error of allowing the . . . [initial] interrogation to be significantly colored by what developed later." The police were "conscientiously interviewing" an apparently respectable homeowner in his home, a man "who was under considerable suspicion" but whom they did not think they could lawfully arrest, and "sedulously abstaining from any threat that they would." "Focus" alone does not trigger the need for *Miranda* warnings, nor indeed does probable cause to arrest. The test is "custodial interrogation," meaning "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of

his freedom of action in any significant way." *Miranda* v. *Arizona,* 384 U. S. 436, 444 (1966). *United States* v. *Hall, supra,* at 543-545, and cases cited. *People* v. *Rodney P. (Anonymous),* 21 N. Y. 2d 1, 10-11 (1967). Contrast *Orozco* v. *Texas,* 394 U. S. 324, 325 (1969); *United States* v. *Bekowies,* 432 F. 2d 8, 12-14 (9th Cir. 1970).

If, contrary to the judge's findings, there was custodial interrogation at some point, *Miranda* warnings were then required. Compare *United States* v. *Scully,* 415 F. 2d 680, 683-684 (2d Cir. 1969), with *Bendelow* v. *United States,* 418 F. 2d 42, 47 (5th Cir. 1969), cert. den. 400 U. S. 967 (1970). Once the police knew where and when the defendant had sold his Mercury, they gave warnings. The judge found, with warrant in the evidence, that the warnings were properly given. He also found that the defendant understood his rights, knowingly and intelligently waived them, and made his statements freely and voluntarily. Explicit statements that he understood his rights and waived them were not essential. *Commonwealth* v. *Murray,* 359 Mass. 541, 544 (1971). *United States* v. *Hayes,* 385 F. 2d 375, 378 (4th Cir. 1967). *United States* v. *Frazier,* 476 F. 2d 891, 897 (D. C. Cir. 1973). *People* v. *Johnson,* 70 Cal. 2d 541, 557-558 (1969), cert. den. 395 U. S. 969 (1969). Cf. *United States* v. *Phelps,* 443 F. 2d 246, 248-250 (5th Cir. 1971). Contrast *Commonwealth* v. *Cain,* 361 Mass. 224, 228-229 (1972).

As to carrying over the waiver at home to the first interrogation at the police station see *United States* v. *Hopkins,* 433 F. 2d 1041, 1045 (5th Cir. 1970), cert. den. 401 U. S. 1013 (1971). The Commonwealth does not contend that the defendant was not prejudiced if there was a *Miranda* violation, nor could it. Although the defendant did not confess to the crimes, his statements were used against him and were damaging. But we think there was no *Miranda* violation.

3. *Jury selection.* The defendant assigns as error the excusing of six prospective jurors. Although they had expressed views against capital punishment, he claims that they had not indicated that those views would preclude them from doing their duty as impartial triers of fact. See

G. L. c. 278, § 3; *Witherspoon* v. *Illinois,* 391 U. S. 510, 522 (1968); *Boulden* v. *Holman,* 394 U. S. 478, 482 (1969); *Maxwell* v. *Bishop,* 398 U. S. 262, 265 (1970). If error was committed in this respect, it affected only the determination of the proper punishment. *Commonwealth* v. *McAlister,* 365 Mass. 454, 457-458 (1974), and cases cited. Since we reverse the judgments in so far as they impose death sentences, we need not consider this assignment further.

4. *Rulings on evidence.* The defendant assigns as error a number of rulings admitting or excluding evidence. We consider first those admitting Commonwealth evidence, then those limiting cross-examination by the defendant, and finally those excluding defense evidence.

(a) *Equivocal statements by the defendant.* A police officer, testifying to the interrogation of the defendant at the Chicopee police station on January 18, 1971, said: "We asked him if he committed the murder and bank robbery at the S.I.S. bank, he says he didn't know, he could have done it, he was high on Mescaline and brandy. We asked him where he picked up the Mescaline from and he said he was driving around the city and he got it from Playtown on Main Street." In addition to his *Miranda* contentions discussed above, the defendant argues that if he lacked knowledge of his own actions by reason of lack of memory due to physical incapacity or the effects of alcohol and Mescaline, his statement was mere conjecture, speculation and hearsay.

The defendant concedes that equivocal statements by a criminal defendant are generally admitted in evidence. See, e.g., *Commonwealth* v. *Burke,* 339 Mass. 521, 532 (1959); *Commonwealth* v. *McGrath,* 351 Mass. 534, 538 (1967). He does not contend that he lacked competence at the time he made his statements. Cf. *Commonwealth* v. *Masskow,* 362 Mass. 662, 666-667 (1972). Extrajudicial admissions of a party to litigation are not necessarily limited by the same rules as testimony at trial. See *Stone* v. *Stone,* 191 Mass. 371, 376 (1906) (opinion); *LaPlante* v. *Maguire,* 325 Mass. 96, 98 (1949) (indefinite character-

ization); Wigmore, Evidence (Chadbourn rev.) § 1053 (1972); McCormick, Evidence, §§ 263-264 (2d ed. 1972); Hughes, Evidence, §§ 513-515 (1961). True or false, the quoted statement of the defendant was relevant to his whereabouts on the date of the crimes. There was no error.

(b) *Refreshing recollection.* The same witness refreshed his memory from written notes. The defendant asserted at a bench conference that the notes were not admissible until the memory of the witness was exhausted, and moved that the notes be removed from the sight of the jury and the witness. The judge said that he would not let the prosecutor refer to the notes except by way of identification and that the notes "will be taken away so the jury doesn't get any idea of what's happening." The defendant argues that there was "mis-application of clearly established rules of evidence with respect to use of memoranda to refresh memory," citing *Commonwealth* v. *Hartford,* 346 Mass. 483, 486-487 (1963). We are unable to ascertain from the defendant's argument or the case cited what error is claimed or how it is claimed to be prejudicial. Cf. *Commonwealth* v. *Pickles,* 364 Mass. 395, 401-402 (1973). Possibly the defendant confuses the rules on leading questions with the rules on using memoranda to refresh memory. In any event, no reversible error is shown.

(c) *Tip to salesman.* The salesman with whom the defendant traded cars testified that the defendant gave him $300, and that "there was a five dollar difference back. I told him I would have to go to the main office to get it back and his words to me were, 'Keep it for the work that you have done.' " Over objection, the salesman then testified that he had never received tips before, and the defendant claims error. We think the evidence was admissible to show a reason for him to remember the transaction and thus was "within the rule that a trial judge may in his discretion allow a witness to testify to facts and circumstances corroborative of his testimony." *Commonwealth* v. *Galvin,* 310 Mass. 733, 747 (1942). *Palmer Russell Co.* v. *Rothenberg,* 328 Mass. 477, 482 (1952).

(d) *Police "experiment."* The defendant told the po-

lice that he had dropped a rifle in three pieces from a bridge over the Connecticut River on January 13, 1971. On January 19 he went with two officers to Brattleboro in an unsuccessful attempt to find the rifle parts. Another officer testified without objection that he participated in a further search on January 20, and that as many as seven officers were standing on the ice on the river at one time in a group. Over objection, he was then permitted to testify that he weighed approximately 280 pounds. The defendant claims error in the admission of this evidence of an "experiment" in the absence of proof that conditions on January 13 were similar to those on January 19 and 20. The absence of such proof was fully disclosed to the jury on cross-examination, and we cannot believe that the evidence of the officer's weight had any significant impact. The Commonwealth argues that there was no experiment, but only an unsuccessful investigative effort. We agree.

(e) *Deletions from police notes.* During the defendant's cross-examination of the chief detective, the defendant offered in evidence the officer's notes, and they were admitted without limitation or objection. The prosecutor then suggested that the witness read only notes compiled by him, defense counsel agreed, and some of the notes were read to the jury. The next day the judge had photostatic copies prepared for the jury, with the portions deleted which were not compiled by the witness. The defendant excepted and argues that it was error to make the deletions. We think that the defendant acquiesced in them, and that in any event the matter was properly within the judge's discretion.

(f) *Motor vehicle identification.* The defendant claims that his cross-examination of prosecution witnesses with respect to the identification of the defendant's Mercury was unfairly limited by the judge at several points. First, an officer who participated in the search for the car testified that he was looking for a green Plymouth Valiant or Mercury Comet, about 1960 model, and that he could tell a Valiant if he saw one. He was asked about the appearance of various parts of the Valiant, including the trunk. Defense

counsel then sought to use a trunk lid in the cross-examination, stating that it came from a 1965 Valiant. The judge refused to permit questions about the trunk lid unless it was identified by a witness, and refused to interrupt the Commonwealth's case to permit such identification. The police officer was asked whether he could tell whether a trunk lid came from a Comet or a Valiant, and the officer said he could not.

Second, another officer testified that he accompanied the witness Shelton to a used car lot where Shelton identified the defendant's Mercury. On cross-examination he testified that he did not know whether there were two Comets on the lot at the time. The question, "Did you take any steps to provide Shelton with two or more Comets to choose from?" was then excluded as argumentative. A little later the officer testified that he had some talk with Shelton, and the question, "And did Shelton tell you that he was looking for a daisy decal?" was excluded in the absence of testimony by Shelton to such a statement.

Third, on the twenty-sixth day of trial the same officer was recalled as a defense witness. He gave repetitive testimony about a signed written statement by Shelton on January 12, 1971, mentioning "a daisy flower sticker" on the car. He then gave repetitive testimony about the identification of the car on January 18 and the fact that it bore a decal which was not in the shape of a daisy. A number of questions were excluded as cumulative and argumentative. Later he testified that Shelton had picked a picture of a 1961 Comet out of a book that did not contain a 1960 Comet. Objections were then sustained to questions why the officer put 1960 in the statement, who put 1960 in the statement, whether the officer was conscious of the fact that Shelton had said 1961, and whether he knew what Shelton had said about the year when they were at the lot on January 18, on the ground that the questions were argumentative and repetitive.

The defendant was allowed very great latitude in cross-examination in a trial lasting thirty-one days, despite repeated objections by the prosecutor that testimony was

being given by the defense counsel rather than by the witnesses. It seems clear that most of the questions now in issue sought testimony which, in the words of defense counsel, would be "corroborative of other testimony and possibly cumulative," and "part of the emphasis on my case." We think that his emphasis was fully communicated to the jury, and that no abuse of discretion by the judge was shown. See *Commonwealth* v. *Underwood,* 358 Mass. 506, 513 (1970).

(g) *Interference with witness.*   On cross-examination of the chief detective, the defendant asked him about a conversation between defense counsel and another Commonwealth witness in the corridor during the trial. A question in the form, "why did you interfere?" was excluded. Thereafter the chief detective testified that he said to the other witness, "you don't have to talk to the defense attorney if you don't want to. We can't stop you from talking, but you don't have to talk to him if you don't want to." There was no error in excluding the "why" question before there had been testimony to the event.

(h) *Condition of motor vehicle.*   The chief detective, recalled as a witness for the defendant, testified how the defendant's Mercury was stored by the police and answered a series of questions about compression tests conducted in his presence by the defendant's mechanic. An objection was sustained to a question whether the chief detective was present when a gauge was put on the third cylinder and read zero, and the defendant took an exception at that point. The mechanic later testified at length about the tests, conducted in June, 1972, including the zero reading. Error is assigned that the defendant was precluded from showing the condition of the car at the time of the crimes, and it is argued that the failure of the prosecution to preserve the car in substantially the same condition prejudiced the defense. The assignment of error is not well taken in view of the seventeen month interval between the crimes and the tests. We find no exception or assignment of error which brings to us any question relating to preservation of the car.

(i) *The defendant's money.* To rebut evidence that he had more money after the crimes than before, the defendant sought to show that some time after the crimes he did not have enough money to pay a lawyer $500. The judge properly sustained objections that the questions were immaterial and leading. The defendant had previously been permitted to show that he had acquired funds from various sources before the crimes.

(j) *Demonstration.* The defendant argues that the denial by the judge of three useful demonstrations was an abuse of discretion. Only one is properly brought before us by an assignment of error, a demonstration calculated to illustrate the physical improbability of the defendant's having been identified by a witness. The witness in question had never identified the defendant; he had stated only that the car, seen near the bank on the day of the crimes and later identified as the defendant's car, was driven by a man dressed in a certain manner. There was no abuse of discretion. *Commonwealth* v. *Flynn,* 362 Mass. 455, 473 (1972), and cases cited.

5. *Criticism of counsel.* On the tenth day of the trial, on recross-examination of the witness Shelton by the defendant, defense counsel restated Shelton's earlier testimony on a point not reopened on redirect examination. The prosecutor objected on that ground, and the judge said, in front of the jury, "Unless you're going to uncover something new, Mr. . . ., we're just wasting time and I think confusing it for everybody." Defense counsel asked for and obtained a bench conference, and objected and took an exception to the judge's remark.

On the twenty-third day of trial, the chief detective was recalled as a defense witness. The defendant asked him a series of questions intended to bring out that a hand gun had been found on the person of one of the deceased bank employees. At a bench conference defense counsel asserted, "This is a discovery procedure on cross examination," and the judge said, "I told you, Mr. . . ., once before, I wasn't going to let you go on any fishing expedition." No exception was taken.

The defendant now argues that these comments were prejudicial, and that they "exemplify the cumulative bias and prejudice which is abundant in [the] record." We think there is nothing in this argument. See *Commonwealth* v. *French,* 357 Mass. 356, 395 (1970); *Commonwealth* v. *Haley,* 363 Mass. 513, 520-522 (1973).

6. *Arguments of counsel.* Discussing "reasonable doubt" in his argument to the jury, defense counsel said, "What it means is the Commonwealth has to satisfy you beyond a reasonable doubt before this boy is strapped in the electric chair." On objection by the prosecutor, there was a bench conference. It was made clear that defense counsel could ask for a recommendation that the death penalty be not imposed, but the judge instructed him not otherwise to comment on the penalty. There was no error. See *Commonwealth* v. *Davis,* 271 Mass. 99, 100-101 (1930); *Commonwealth* v. *O'Connell,* 274 Mass. 315, 323 (1931).

The prosecutor argued to the jury that the crimes had been committed by a "pretty cool guy," and that they could take account of the demeanor of the defendant. He then asked, "Who's the coolest, calmest, [most] collected person in this courtroom? . . . Who is cool — who is calm — who is suggesting questions — who is reading transcripts?" No objection was made or exception taken. The judge charged the jury at length that they were the judges of the facts and that statements of counsel were not evidence. In this situation the only question before us is whether a miscarriage of justice has occurred. *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 313-316 (1973). We conclude that there has been no miscarriage of justice. The jury were entitled to observe the demeanor of the defendant during the trial, and the comment by the prosecutor did not suggest that he had knowledge the jury did not share. *Commonwealth* v. *Dunker,* 363 Mass. 792, 799-800 (1973). See Wigmore, Evidence (3d ed.) § 274 (1940). It would of course be improper to suggest that reading transcripts and suggesting questions to counsel show consciousness of guilt, but it is not irrational to suggest that such actions bear on

coolness under stress. Cf. *Commonwealth* v. *Balakin,* 356 Mass. 547, 551 (1969).

7. *"Return" of jury.* The defendant contends that the judge erred by coercing a verdict from the jury in violation of G. L. c. 234, § 34.[1] The jury left the court room to commence deliberations at 9:12 A.M., June 20, 1972. They came into the court room at 3:25 P.M., and at their request the judge read again the portions of his charge dealing with circumstantial evidence and reasonable doubt. They went out to resume their deliberations at 4:06 P.M. They came into the court room again at 10:33 P.M., and the judge inquired "whether or not a few more hours this evening of deliberating would be helpful or fruitful to your deliberations?" On receiving a negative answer from the foreman, the judge sent the jury to a motel.

The following morning, June 21, the jury sent to the judge a question as to the effect on a witness's testimony of a written statement by the same witness. About an hour later the foreman sent the judge a note, "I do not feel that any more progress can be made regardless of time." Thereafter, in a lobby conference with counsel, the judge decided to answer the question before taking action on the note, and denied the defendant's motion for a mistrial. The jurors came into the court room at 12:13 P.M., the judge answered their question, and they left at 12:20 P.M. At 3:37 P.M. the judge received a further communication from the jury, "further discussion useless." He informed counsel, denied a renewed motion for a mistrial, and brought the jury into the court room at 4:47 P.M. After instructing them further, he sent them back for further deliberations without asking their consent.

The defendant argues that the fourth statutory "return

---

[1] "If a jury, after due and thorough deliberation, return to court without having agreed on a verdict, the court may state anew the evidence or any part thereof, explain to them anew the law applicable to the case and send them out for further deliberation; but if they return a second time without having agreed on a verdict, they shall not be sent out again without their own consent, unless they ask from the court some further explanation of the law."

to court" occurred on the afternoon of June 21. We disagree
and hold that that was the first such "return." There is no
showing that the returns on June 20 were "after due and
thorough deliberation." The fact that on their first return
the jurors asked from the judge a further explanation of the
law was a very strong indication that they thought their
deliberation was not yet "due and thorough." Cf. *State* v.
*Simon,* 126 S. C. 437, 444 (1923). Moreover, as the judge
pointed out, the case was complex; it rested on circum-
stantial evidence, the testimony of seventy-eight witnesses,
and over 250 exhibits. In view of the complexity of the case,
we think it was open to the judge to determine at the end of
the day that deliberation had not yet been "due and
thorough," even though thirteen hours had elapsed since
deliberation began.

As for the events of June 21, the judge thought the
foreman's note beginning, "I do not feel," could be read as a
personal opinion, and distinguished the communication on
the afternoon of June 21 as a collective decision of the jury.
We think the distinction is supported by the fact that the
earlier note was sent while a question from the jury
remained unanswered. Hence the first return of June 21 did
not bring the statute into operation.

We have said, "It is too clear for discussion that the mere
statement to the officer in charge that they could not agree
was not a foundation for the application of this statute."
*Dixon* v. *A. J. Cunningham Co.* 257 Mass. 63, 71 (1926). We
think it equally clear that a return to court to receive
answers to questions asked by the jury does not bring the
statute into operation. The cases cited to us as supporting
reversal under comparable statutes of other States seem to
us to involve circumstances more coercive than those
shown here. *State* v. *Kelley,* 45 S. C. 659, 663-666 (1895).
*State* v. *Simon, supra,* at 445-446. See *State* v. *Albers,* 174
N. W. 2d 649, 652-656 (Iowa, 1970); *Wilke* v. *Milwaukee
Elec. Ry. & Light Co.* 209 Wis. 618, 625-626 (1932).

8. *The Tuey charge; polling the jury.* When the jury
returned to court on the afternoon of June 21, the judge
gave them the so called *Tuey* charge, omitting the portion

on reasonable doubt, on which he had previously given a repeated charge. See *Commonwealth* v. *Tuey,* 8 Cush. 1, 2-3 (1851). There was no error. *Commonwealth* v. *Rollins,* 354 Mass. 630, 636-639 (1968). He, of course, did not have the benefit of our recent opinion in *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 101-102 (1973). Cf. *United States* v. *Angiulo,* 485 F. 2d 37, 40 (1st Cir. 1973).

The judge refused to permit the defendant to poll the jury after verdict. No abuse of discretion is shown. *Commonwealth* v. *Fleming,* 360 Mass. 404, 408 (1971).

9. *Section 33E.* On appraisal of the whole record, we find no occasion to disturb the convictions under G. L. c. 278, § 33E. But the death sentences cannot stand under *Furman* v. *Georgia,* 408 U. S. 238 (1972), and the defendant is entitled to be resentenced to life imprisonment. *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14-15 (1973).

The judgments, in so far as they impose death sentences, are reversed, and the cases are remanded to the Superior Court, which is to resentence the defendant to imprisonment for life.

*So ordered.*