COMMONWEALTH vs. CARL M. BENJAMIN
(and two companion cases[1]).

Middlesex.   September 22, 1975. — December 19, 1975.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Conspiracy. Evidence,* Of conspiracy. *Practice, Criminal,* Trial of
defendants together, Trial of indictments together, Judicial discre-
tion, Mistrial, Conspiracy case, Sentence, Newspaper article. *Plead-
ing, Criminal,* Indictment, Variance, Bill of particulars. *Jury and
Jurors.*

There was no abuse of discretion in the denial of a motion to dismiss
an indictment for conspiracy to forge, utter and steal containing 122
counts, on the ground of the prosecutor's failure to obtain "more
simply framed" indictments, where the motion failed to specify the
counts on which new indictments could be obtained and the counts
as to which new indictments would be barred by the statute of
limitations. [614-616]
The denial of a motion for further particulars to a conspiracy indict-
ment containing many counts was not an abuse of discretion where
the motion did not seek further particulars as to any specific count
or group of counts. [616-617]
Where there are multiple, and some apparently overlapping, charges
of conspiracy in an indictment, and the evidence warrants an inter-
pretation that there was more than one conspiracy but does not war-
rant findings of as many conspiracies as there are charges, and there
appears to be a genuine question of fact as to the actual number of
conspiracies in which the defendant may have participated, such
question should be submitted to the jury, whether by special ques-
tions, by appropriate instructions, or by a combination of such
courses. [617-620]
In proceedings on conspiracy indictments resulting in the conviction of
each defendant on more counts than the number of conspiracies in
which he was implicated by the evidence and the actual number of
underlying conspiracies was never determined, the defendants failed
properly to preserve, by appropriate requests for instructions or by
exceptions to the charge or during the sentencing process, the ques-

---

[1] Commonwealth vs. Edward M. Roberts and Commonwealth vs.
Robert C. Lawrence.

Commonwealth *v.* Benjamin.

tions whether a single conspiracy had been fragmented into many separate criminal offences and the defendants had been subjected to the possibility of multiple punishments for participation in a single offence. [620-623]

At the long joint trial of defendants on separate conspiracy indictments each containing many separate counts, there was no abuse of discretion in the denial of motions to sever defendants and counts for trial, or motions for a mistrial, although the total number of conspiracies was never properly determined as a fact, where the actual number of conspiracies may have been relatively small, the evidence was not so complex as necessarily to result in confusion, the responsibility of each defendant emerged from the evidence separate and distinct from that of others, as the jury recognized and preserved by their verdicts, and all the conspiracies but one resulted in thefts from the same corporate entity by forgeries. [623-627]

The judge at the trial of an indictment properly refused to make "any advance rulings" with respect to the use which might be made at any future trial of testimony which the defendant might give if he took the stand at the current trial. [627-628]

With respect to counts of a conspiracy indictment against the executive vice president of a finance company directed to the breakdown to $15,000 each of its loans which exceeded that amount, undertaken to comply with an agreement with insurance companies which had lent money to the finance company restricting the number of its loans over $15,000, and effectuated by new and fictitious loans each supposedly evidenced by a forged promissory note payable to the finance company in an amount less than $15,000 each, the defendant's motion for a directed verdict should have been allowed where there was no direct evidence that he participated or acquiesced in the breakdown loans and it appeared that he worked mainly in Boston and was concerned with business of the company other than its day-to-day operations, that the conspiracy took place largely in Chelmsford, and it was not shown that the defendant was aware of the conspiracy while it was in progress. [628-633]

With respect to counts of a conspiracy indictment against the executive vice president of a finance company directed to the sale of shares of its common stock to a business trust, undertaken in order to increase the company's net worth and thus cure its violation of restrictions on the payment of dividends to holders of its common stock as set forth in an agreement with a purchaser of shares of the company's preferred stock, the defendant's motion for a directed verdict should have been allowed, although he was the prime instigator of the purchase of the common stock by the trust, where the evidence did not establish that he participated in, or was aware of, any of the illegal activities involved in raising the purchase money and was as consistent with innocence as with guilt. [634-641]

No ground for reversal of convictions of defendants was shown by reason of the trial judge's treating by instructions, rather than by polling the jury or declaring a mistrial, a newspaper article brought to his attention on the morning of the second day of trial erroneously stating that the defendants had "pleaded guilty when originally indicted." [641-642]

INDICTMENTS found and returned in the Superior Court on October 21, 1968.

Pre-trial motions were heard by *Dimond, J.,* and the cases were tried before him.

*John F. Palmer (Thomas J. Herbert* with him) for the defendant Robert C. Lawrence.

*William P. Homans, Jr.,* for the defendant Edward M. Roberts.

*Terence M. Troyer,* Assistant District Attorney *(Dante DeMichaelis,* Assistant District Attorney, *& Harry C. Mezer,* Legal Assistant to the District Attorney, with him) for the Commonwealth.

GRANT, J.   Benjamin, Roberts and Lawrence have each been convicted by a jury of numerous charges of conspiracy. In order to place in proper perspective the various exceptions which have been argued by each defendant, it will be necessary to outline at some length the salient features of these cases as they pursued a common course from indictment to sentence.[2]

On October 21, 1968, a grand jury sitting in Middlesex county returned a welter of indictments against Benjamin, Roberts, Lawrence, one Paul J. Brousseau, and one Claire Monroe, alleging the commission by each of a variety of white collar crimes. Included in the welter were separate conspiracy indictments against each of the five named above. Each of those indictments originally contained 128 separate counts. Each count of each indictment alleged that on a stated date the particular defendant named therein had conspired with the other four named above "(1) to forge a certain instrument purporting to be a promissory note with intent to injure and defraud, (2) to utter and publish as true a certain forged instrument well knowing the same to be forged, with intent to injure and

_____

[2] Portions of the following outline are gleaned from the original papers in *Commonwealth* v. *Benjamin,* 358 Mass. 672 (1971). See *Flynn* v. *Brassard,* 1 Mass. App. Ct. 678, 681 (1974). We omit from the outline proceedings which are no longer challenged or which do not serve to illuminate exceptions which have been argued.

defraud, and (3) to steal money of the property of First Finance Corp." The date stated in any particular numbered count of any one indictment was repeated in the same numbered count of each of the other four indictments. Shortly after the return of the indictments the prosecution eliminated six counts of each indictment by nolle prosequi; the counts so eliminated bore the same numbers (and alleged the same dates of offence) in each indictment.

The remaining 122 counts effectively charged each defendant with having conspired with the other four defendants to forge, utter and steal from First Finance Corp. (FFC) on a total of sixty-two different dates ranging in time from October 1, 1964, to January 16, 1967. As many as eight separate conspiracies were alleged to have been entered into on a single date. In response to motions of the defendants and orders of the court, the prosecution filed a bill of particulars with respect to each count of each indictment. Each bill purported, among other things, to identify a particular individual whose name was said to have been employed by the defendants in creating a fictitious loan from FFC. The name disclosed in the bill filed with respect to any particular numbered count of any one indictment was repeated in the bill filed with respect to the same numbered count of each of the other four indictments; there were 122 such names in all. Except in the respects just indicated, the bills filed with respect to each count of each indictment were identical.[3]

Shortly after receipt of the bills of particulars Benjamin, Roberts, Lawrence and Monroe (but not Brousseau) filed motions to dismiss the indictments against them, principally on the ground (as asserted in the motions) that "the Commonwealth has taken a single conspiracy and has fragmented it into 122 counts on the principle that each overt act committed pursuant to the conspiracy constitutes a separate and distinct conspiracy." A judge of the Superior Court made certain findings which tended to support the

---

[3] The information sought by each motion for particulars and a sample bill of particulars appear in Appendix A hereof.

quoted contention, allowed the motions, dismissed the indictments, and reported the propriety of his actions to the Supreme Judicial Court. The report contained no factual support for the defendants' contention, and in *Commonwealth* v. *Benjamin,* 358 Mass. 672 (1971),[4] it was held that the indictments were sufficient and should not have been dismissed.

Turning to questions which had not been reported, the court had the following to say: "The bills of particulars do strongly indicate that the form of the indictments is clumsy and repetitious. In effect, 122 counts have been employed to set forth what could reasonably be viewed as a single conspiracy (or perhaps only a few conspiracies). The form of the indictments, however, may not obscure the circumstance that each count sufficiently sets forth a serious criminal charge which, read with the related bill of particulars, adequately advises each defendant of the charge against him. Each count refers to a particular criminal act, which at trial may be proved to be either (a) an unlawful act in furtherance of a continuing conspiracy, or (b) in itself, the unlawful object of a conspiracy to commit that act. The statement of the substantive charges against the defendants has not been shown to be inadequate in any way. The defendants' arguments on the alleged fragmentation of the charges seem to be addressed merely to inconsequential niceties of form. The conspiracy indictments could and should have been expressed more concisely and in a manner more consistent with the clear, informative statements in the narrative bill of particulars" (358 Mass. at 675); and, "Our holding that the dismissal of the indictments was not proper should not be regarded as approval of the practice of obtaining multiple, repetitious, and overlapping indictments (or counts in indictments) where fewer indictments or counts not only would suffice, but probably would much more clearly present the charges. Multiple indictments, such as those in the present cases, impose an unnecessary burden on courts, juries, and parties. They cause unneces-

---

[4] Which we shall refer to as *"Benjamin (No. 1)."*

sary expense and confusion, and may lead to unduly long trials. We regard the practice as objectionable. Where new indictments, more simply framed, may still be obtained within the period of the applicable statute of limitations, we think a trial judge may and should require a district attorney to attempt to obtain them" (358 Mass. at 677-678). The court also suggested the possibility that further bills of particulars might be in order (358 Mass. at 676 [n.6] and 677 [n.7]).

Approximately three months after the date of the rescript in *Benjamin* (*No. 1*), Benjamin, Roberts, and Lawrence filed separate motions to dismiss the indictments against them because the prosecutor had made no attempt during the intervening period to secure new and more simply framed indictments. Roberts and Lawrence also filed motions to strike the bills of particulars which related to them and for further particulars.[5] A judge of the Superior Court[6] denied each of those motions "as a matter of discretion." Roberts sought interlocutory relief with respect to the denial of his motion to dismiss from a single justice of the Supreme Judicial Court. The single justice denied the relief requested, apparently with some form of suggestion that Roberts explore the possibilities of severance in the Superior Court.

Benjamin, Roberts, Lawrence and Monroe (but not Brousseau) thereupon filed (or resurrected then pending) motions to sever defendants and counts for trial. When considered in the light of the previous history of these cases, the hearing on those motions was perfunctory at best. The judge appears to have assumed the existence of a prior order that all the conspiracy indictments be tried

---

[5] The record before us does not disclose the filing of a like motion by Benjamin. As Monroe has not sought appellate review of her convictions, we do not know what pre-trial motions she may have filed. Brousseau does not appear to have filed any significant pre-trial motions.

[6] The judge who heard and determined all the pre-trial motions which are considered in this opinion also presided at the trial.

together.[7] He gave no appearance of having consulted the grand jury minutes. See *Benjamin* (*No. 1*), 358 Mass. at 677. The prosecutor did not volunteer, nor did the judge require, any explanation of the evidence to be offered in support of any count (or group of counts) in any indictment. Contrast *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 225-226 (1971), cert. den. sub nom. *Farrell* v. *Massachusetts*, 407 U. S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U. S. 914 (1972).[8] So far as the hearing was concerned, the judge did not even inquire of the prosecutor whether he could suggest some means of simplifying the trial.

The judge denied a severance of defendants (indictments). He did, however, grant partial relief. "[I]n order to promote a fair determination of each defendant's guilt or innocence of the various offenses charged," the judge ordered that sixty-two of the 122 counts of each indictment be severed and that the trial proceed on the remaining sixty counts of each indictment; the pertinent order contained a proviso that nothing therein contained should "preclude a defendant from moving during trial for a further severance of counts if such severance should then be deemed necessary." The order left to the prosecutor the determination of the sixty-two counts to be severed.[9] The order set out no standard by which he was to make his determination of the counts to be tried; the election filed by him contained no hint of the means by which he had made his selections.

On the first day of the trial, and out of the hearing of the jury venire, Brousseau pleaded guilty to all sixty counts of the indictment then scheduled for trial. He became the prosecution's chief witness during the trial.

It appeared at trial that FFC was a finance company which had originated in Lowell but had later moved its

---

[7] We have been unable to discover any such order.

[8] Which we shall refer to simply as the "*Beneficial* case."

[9] With the qualification that the severed counts be identical (bear the same numbers) with respect to each defendant.

executive offices to Chelmsford. It had branch offices in Chelmsford, Lowell, and elsewhere in Massachusetts and in three of the other New England States.[10] Lawrence, whose principal office was on the fringe of the Boston financial district, was, at all material times, the executive vice president of FFC; his duties included the negotiation with insurance companies of financing agreements by which FFC obtained working capital for its operations and which contained certain restrictions on FFC's lending and dividend policies. Roberts, whose office was in Chelmsford, was the assistant treasurer of FFC, with extensive supervisory authority. Monroe was Roberts' personal secretary. Brousseau, who had originally been hired in a subordinate capacity, was rapidly promoted to the position of administrative assistant to Roberts. Benjamin had no official connection with FFC. He was experienced in the finance business (having previously been associated with Lawrence in the operation of another finance company), was a substantial borrower from FFC, owned or controlled two finance companies with which FFC had questionable business dealings, and was a director of and a substantial stockholder in a bank in which FFC had a checking account. Brousseau and all the defendants except Monroe were or became trustees of or subscribers to the Paul E. Sheehan Trust, a business entity formed for the purpose of securing corporate control of FFC.

It appeared, as the trial progressed, that the evidence would not warrant a finding that there had been a single overall conspiracy which had persisted from October of 1964 until January of 1967 and which had been formed or joined by all the defendants (and Brousseau). To the contrary, the evidence was susceptible of the interpretation that during the period in question there had been as many as sixteen separate conspiracies, each of which had been

---

[10] Each branch office was comprised of two wholly owned subsidiaries of FFC. The cases were tried on the footing, and the jury were instructed (without objection), that no distinction need be drawn between FFC and its subsidiaries.

Commonwealth *v.* Benjamin.

formed or joined by two or more of the defendants (or by one or more of the defendants and Brousseau) and the salient features of which are outlined in columns 1 through 6 of Appendix B hereof.[11] The objective of each such conspiracy had been accomplished or facilitated by the forgery (by or at the direction of one or more of the defendants or Brousseau) of one or more promissory notes payable to the order of FFC which purported to represent genuine loans made by it to borrowers in the normal course of business. In point of fact, each such note could be taken to represent an overt act committed in furtherance of a conspiracy. It soon became obvious, when the evidence was analyzed in the light of the allegations of the indictments and the pertinent bills of particulars, that each indictment had been drafted in such fashion as to include a separate count for each forged note (overt act). It also became obvious that each indictment contained more counts than the number of underlying conspiracies which the jury would have been warranted in finding on the evidence.

As each item of specific (as opposed to general background) evidence was offered by the prosecutor, the judge required him to specify the particular count or group of counts on which the item was being offered. As soon as the prosecutor so specified, the judge made preliminary rulings (based in each instance on the then state of the evidence) as to the defendants against whom each such item would be admitted, and on which counts. Having in mind that each count represented a specific overt act (forged note), this process had the (apparently intended) effect of concentrating the jury's attention on the evidence concerning the preceding acts of the defendants (or Brousseau) which had generated each forgery, and thus on the underlying conspiracy (if any) to which each count was directed. As the evidence tended to show, in many instances, that a single conspiracy had generated more than one forgery,

---

[11] The numbers assigned to the various possible conspiracies in the first column of Appendix B were not employed by the trial judge but have been assigned by us to facilitate discussion of various points argued by the defendants.

Commonwealth *v.* Benjamin.

the counts came to be grouped by underlying conspiracies for purposes of preliminary rulings on the admissibility and applicability of specific items of evidence.[12] Those same groupings of counts were subsequently employed by the judge at the close of the prosecution's case when he had occasion to act on (1) the prosecution's motions to expand certain items of evidence so as to make them applicable to additional defendants on various counts (see *Commonwealth* v. *Benesch,* 290 Mass. 125, 132-133 [1935]; *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50-51 [1965]; *Commonwealth* v. *French,* 357 Mass. 356, 379-380 [1970], judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936 [1972]; *Beneficial* case, 360 Mass. at 231 [n.12], 310-312, 369-370) and (2) the defendants' motions for directed verdicts with respect to particular counts.

The defendants collectively and vehemently objected to the grouping process, and almost every evidentiary ruling was met by objections made and exceptions taken by the particular defendants affected thereby.[13] On numerous occasions Benjamin presented oral motions to dismiss the indictment against him on the ground of fragmentation. Roberts and Lawrence presented a plethora of motions (some oral and some in writing) to sever still further the counts against them.[14]

The judge did not permit the jury to determine the number of conspiracies in which any of the defendants might

---

[12] The manner in which the counts were grouped appears in columns 1 and 7 of Appendix B.

[13] None of those exceptions has been specifically argued before us. Nor is there any discussion of the fact that the grouping process resulted in the elimination by directed verdicts of massive blocks of counts against each defendant.

[14] On the twenty-first day of trial the judge allowed motions by Benjamin and Roberts to sever fourteen additional (and identically numbered) counts of the respective indictments against them, ones on which the prosecution had not yet offered any evidence. Lawrence did not file a like motion, but he ultimately secured directed verdicts on each of the fourteen identically numbered counts of the indictment against him.

have participated and which it could have been found underlay various of the counts on which the respective cases were submitted to the jury.[15] Instead, on the seventy-second day of trial the judge instructed the jury to determine the guilt or innocence of each defendant in the light of the evidence admitted against him on each particular count and to return a verdict of guilty or not guilty on each count against each defendant. The jury did so, and found Benjamin guilty on thirty counts, found Roberts guilty on thirty-eight counts, and found Lawrence guilty on fifteen counts.[16] The judge sentenced each defendant to serve two and a half years in the house of correction on each count on which he had been convicted. The various sentences were grouped (by counts) in such fashion that each was to be served concurrently with others and further grouped in such fashion that each defendant effectively received three consecutive terms of two and one half years each, or an aggregate of seven and one half years.[17]

With this overview of the proceedings we may now turn to the particular exceptions argued by each defendant.

*1. Roberts' second motion to dismiss the indictment against him.*[18] On May 10, 1971, Roberts filed a motion, styled as one "for appropriate relief," in which he recited the language previously quoted from *Benjamin (No. 1)* that "[w]here new indictments, more simply framed, may still be obtained within the period of the applicable statute of limitations, we think a trial judge may and should require a district attorney to attempt to obtain them" (358 Mass. at 678), and asserted that the prosecution had made

---

[15] As the results of severances and directed verdicts, the cases went to the jury on thirty counts against Benjamin, forty-five counts against Roberts, and eighteen counts against Lawrence.

[16] The counts on which each defendant was found guilty appear in columns 7 and 8 of Appendix B.

[17] The mechanical details of the sentencing process as it affected each defendant can be ascertained from a perusal of columns 7 through 11 of Appendix B.

[18] Neither Benjamin nor Lawrence has argued to us that there was error in the denial of their like motions.

no attempt to secure any such indictments in the period following the rescript from the Supreme Judicial Court on February 9, 1971. The motion concluded with a prayer that "the *indictments* herein be dismissed" (emphasis supplied). The motion was, after hearing, denied "as a matter of discretion."[19]

Roberts argues that the recited language constituted a "holding" of the Supreme Judicial Court which required dismissal of the indictments against him. We do not agree. The only holding of that court was that "the dismissal of the indictments was not proper" (358 Mass. at 677). We think the recited language must be read in context. The reference therein to "the period of the applicable statute of limitations" shows obvious concern for the problem, apparent from the record then before the court (see n.2, *supra*), that the prosecution would have been barred by the six-year statute of limitations found in G. L. c. 277, § 63, from seeking new indictments with respect to any of the offences charged in the first eighteen counts of each of the pending indictments.[20] We are of the opinion that the court intended nothing more than a suggestion of a specific means by which the trial judge might exercise his discretionary authority to simplify a trial of such charges as would not be barred by the statute of limitations if new indictments should be sought.

As we read the motion, it sought dismissal of the indictment as a whole (i.e., all 122 counts) and failed to distinguish between those charges (counts) as to which new

---

[19] The motion was not accompanied by an affidavit of the type contemplated by the second paragraph of Rule 46 of the Superior Court (1954) (see now Rule 9 of the Superior Court [1974]), and the record is completely silent on the question whether the prosecution made any attempt to secure new indictments against any of the defendants. We assume from the facts that the judge granted a hearing on the motion and denied it "as a matter of discretion" that he believed no such attempt had been made.

[20] That number had grown to twenty-four by the time the instant motion was filed. Included in that number were sixteen counts on which Roberts was ultimately convicted. See Appendix B, conspiracies 1 through 4, columns 7 and 8.

indictments could be obtained and those as to which new indictments would be barred. The motion could not be allowed in its entirety. How far the judge would go in attempting to sort out the possible from the impermissible lay within his discretion. We are not convinced that he abused his discretion.

2. *Roberts' motion to strike the particulars and for further answers.*[21] This motion was also filed on May 10, 1971; it was also denied "as a matter of discretion." Roberts devotes a significant portion of his brief to the indisputable proposition that the purpose of a bill of particulars is to "give a defendant reasonable knowledge of the nature and character of the crime charged" (*Commonwealth* v. *Iannello,* 344 Mass. 723, 726 [1962]; *Benjamin* [*No. 1*], 358 Mass. at 676) and even essays an argument that he was constitutionally entitled to further particulars in order to prepare a proper defence (see *Commonwealth* v. *Baker,* 368 Mass. 58, 76-77 [1975]). Such arguments are beside the point[22]; the specifically stated grounds of the motion were that the original particulars were "unresponsive and prejudicial."

Roberts does not argue that he was in fact prejudiced by the denial of the motion. The only prejudice we have discovered for ourselves is legally immaterial, that the jury heard a description of damaging matters at the outset of the trial which were not proved until later in the trial.[23] The particulars were, with the single exception already noted, identical as to all counts of each indictment. They

---

[21] Lawrence no longer pursues the like motion filed by him.

[22] They also ignore the statement in *Benjamin* (*No. 1*) that "each count ..., read with the related bill of particulars, adequately advises each defendant of the charge against him," as well as the accompanying characterizations of the particulars as "clear" and "informative" (358 Mass. at 675).

[23] A sample bill of particulars was read to the jury without objection at the outset of the trial, together with a sample (but numerically unidentified) count of each indictment. The particulars were not shown to the jury, and the judge advised them in his charge that "they are not evidence."

appear to have been intended as an outline of the prosecution's entire case on all counts, supplemented by a statement of some of the evidence which the prosecution intended (or at least hoped) to introduce in support of certain of the counts. They were, as Roberts argues and as the prosecution now all but concedes, unresponsive to the allegations of any given count to the effect that a conspiracy had been entered into on or about the date distinctly stated therein. But here again the motion was general; it did not seek further particulars as to any specific count or group of counts.[24]

We are of the opinion that the present is an instance in which the allowance or denial of the motion was a matter within the discretion of the judge. See the cases cited in *Commonwealth* v. *Baker,* 368 Mass. 58, 75-76 (1975). Again we see no abuse of discretion.

*3. Fragmentation and related matters.* Fragmentation may be defined as the breaking down of a single conspiracy into its constituent phases (including possible overt acts in furtherance of the conspiracy) and charging each such phase as a separate offence.[25] Fragmentation may also be defined as the charging of more than one offence when the objective of a single conspiracy has resulted in the commission of more than one crime (either statutory or common law). Fragmentation can occur if the draftsman of an indictment fails or is unable to determine the number of conspiracies disclosed by the evidence before the grand

---

[24] It will be noted from Appendix A that the penultimate subparagraph of paragraph 3 of the particulars asserted that "fictitious loans were created in *groups* so that some of the proceeds were used for more than one purpose . . . ." (emphasis supplied).

[25] As was said by Mr. Justice Holmes in *United States* v. *Kissel,* 218 U. S. 601, 607 (1910), in a somewhat different context: "When the plot contemplates bringing to pass a continuous result that will not continue without the continuous coöperation of the conspirators to keep it up, and there is such continuous coöperation, it is a perversion of natural thought and of natural language to call such continuous coöperation a cinematographic series of distinct conspiracies, rather than to call it a single one."

jury[26] and charges more conspiracies than existed, or if the draftsman loses sight of the proposition that under our law the crime of conspiracy is complete as soon as the unlawful agreement is formed[27] and concentrates instead on the overt acts performed in furtherance of one or more conspiracies. However caused, the principal vice of fragmentation, if it goes undetected, is that it may result in multiple punishments for participation in a single conspiracy. The most commonly employed remedy, when fragmentation is detected, is to ignore the number of charges on which a defendant may have been convicted and to impose but a single sentence for each underlying conspiracy. See *Braverman* v. *United States*, 317 U. S. 49, 53-54, 55 (1942); *United States* v. *Mori*, 444 F. 2d 240, 241-246 (5th Cir. 1971), cert. den. 404 U. S. 913 (1971); *United States* v. *Honneus*, 508 F. 2d 566, 569-570 (1st Cir. 1974), cert. den. 421 U. S. 948 (1975). Compare *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306-309 (1972); *Commonwealth* v. *White* (*No. 2*), 365 Mass. 307, 310, 311 (1974), cert. den. 419 U. S. 1111 (1975).

The difficulty comes in the practical application of the foregoing and related principles to the circumstances of a particular case. If there is a single charge of conspiracy and the evidence at trial is insufficient to warrant a finding of more than one conspiracy, there is no problem because there is no fragmentation. If there is a single charge of conspiracy and the evidence at trial is properly susceptible of the interpretation that the conspiracy charged was in fact two or more separate conspiracies, the judge should instruct the jury to acquit if they find that there was more

---

[26] This can be a serious problem. If an indictment charges a single conspiracy and the evidence at trial discloses two or more separate and distinct conspiracies, a defendant may be entitled to a directed verdict on the ground of variance. See the *Beneficial* case, 360 Mass. at 371, 372.

[27] See *Commonwealth* v. *Hunt*, 4 Met. 111, 125 (1842); *Commonwealth* v. *Shea*, 323 Mass. 406, 412-413 (1948); *Commonwealth* v. *David*, 335 Mass. 686, 696-697 (1957); *Beneficial* case, 360 Mass. at 249, 372-373.

than one conspiracy. This is so because the actual number of conspiracies is a question of fact for the jury (see the *Beneficial* case, 360 Mass. at 371-372), there may be a variance between the evidence and the charge, and "[t]he offence must not only be proved as charged, but it must be charged as proved." *Commonwealth* v. *Ancillo,* 350 Mass. 427, 430 (1966), and cases cited.

If there are multiple and apparently overlapping charges of conspiracy and the evidence at trial is insufficient to warrant a finding of more than one conspiracy, the judge should submit all the charges to the jury with an instruction to return separate verdicts on each charge; if the jury return guilty verdicts on two or more charges, the judge should sentence as for a single offence in accordance with the *Braverman* line of cases. If there are multiple but not overlapping charges of conspiracy and the evidence at trial is properly susceptible of the interpretation that a defendant participated in as many conspiracies as there are charges and the evidence discloses no substantial nexus between the conspiracies, the judge should submit all the charges to the jury with an instruction to return separate verdicts on each charge; if the jury return guilty verdicts on more than one charge, the judge may sentence separately on each charge. This is no more than a simple consolidation of separate cases for trial, although the consolidation may be improper for reasons not material to the present discussion.

So much is more or less obvious. The critical question comes in cases such as the present, where there are multiple (and some apparently overlapping) charges of conspiracy, the evidence at trial is properly susceptible of the interpretation that there was more than one conspiracy but does not warrant findings of as many conspiracies as there are charges, and there appears to be a genuine question of fact as to the actual number of conspiracies in which each defendant may have participated. We have been referred to no decided case covering such a situation, nor have we found one. We are of the opinion that in a case such as the present the question of the actual number of

conspiracies in which each defendant may have partici-
pated is one which should be submitted to the jury for
their determination as a matter of fact (see the *Beneficial*
case, 360 Mass. at 371-372; *United States* v. *Varelli,* 407
F. 2d 735, 746 [7th Cir. 1969]), whether by special ques-
tions (*Beneficial* case, 360 Mass. at 299-300), by appro-
priate instructions (to find the actual number of con-
spiracies in which each defendant may have participated,
identify the particular charges [if any] directed to those
conspiracies, return separate verdicts on each of the charges
so identified, and acquit on all the charges which cannot
be identified or which are found to be duplicative of any
charge on which they have already determined guilt or
innocence), or by a combination of those courses; if the
jury then return guilty verdicts on more than one charge,
the possibility of fragmentation will have been eliminated,
and the judge may safely impose a separate sentence on
each charge on which each defendant has been found guilty.

No such course was followed in the present cases. Even
after all the severances, there were still more conspiracy
counts on which each defendant was being tried than the
total number of conspiracies in which he had been impli-
cated by the evidence.[28] Unless the jury should acquit all
defendants on all counts, some measure of fragmentation
was likely to occur unless the judge were to follow at least
one of the courses we have just outlined in the previous
paragraph. He did not follow any of those courses, although
he was distinctly aware of all the possibilities. Instead, as
already noted, he required the jury to return separate ver-
dicts as to each defendant on all the counts which were
submitted to the jury. The jury did so, and there is no
room for doubt that each defendant has been convicted of
more counts than the number of conspiracies in which he
might have participated.[29] The judge, in the course of the
sentencing process, appears to have assembled in groups
the various counts on which each defendant had been found

---

[28] See and compare columns 1, 4 and 7 of Appendix B.

[29] See and compare columns 1, 4, 7 and 8 of Appendix B.

Commonwealth *v.* Benjamin.

guilty and then to have assigned each group of counts to one of the three consecutive terms of two and a half years each which he constructed for each defendant.[30] The judge gave no explanation of his reasons for grouping the counts in the manner employed by him[31], although one might infer that he grouped the counts in the same manner in which he had previously grouped them on the occasions of his rulings on the prosecution's motions for expansions of evidence and the defendants' motions for directed verdicts. The judge did not give any express indication of his belief as to the number of conspiracies in which any of the defendants might have participated.[32] It is possible that the judge did apply the *Braverman* principle in such fashion as to eliminate any possibility of multiple punishments for the same offence. But such a result is no more than a theoretical possibility, because the jury were not permitted (as they should have been) to determine the number of conspiracies in which each defendant might have participated.

We are of the opinion, however, that none of the defendants is any longer in a position to complain of possible fragmentation or multiple punishments. On a number of occasions during the trial, in the course of bench colloquies or conferences with counsel, the judge stated that he did not intend to submit to the jury the question of the number of underlying conspiracies which might be disclosed by the evidence, that he intended to submit each count to the jury

---

[30] See columns 7 through 11 of Appendix B.

[31] All we know is that the judge accepted the prosecutor's recommendations as to groupings and terms so far as Lawrence was concerned. The judge accepted the prosecutor's recommendation with respect to three consecutive terms for Benjamin and Roberts but rejected the recommendations with respect to how groups of counts should be assigned to terms.

[32] It might be possible to infer from the three consecutive terms given each defendant that the judge impliedly found each had participated in three conspiracies. We think, however, that it can also be concluded with equal reason that the judge thought an aggregate of seven and one half years (three consecutive terms of two and one half years each) was the appropriate punishment for all the offences which might have been committed by each defendant, without regard to the actual number of offences.

for a separate verdict as to each defendant, and that he proposed (in the event of guilty verdicts) to avoid the possibility of multiple punishments by applications of the *Braverman* principle in accordance with his understanding thereof. Such statements were ones of intention to which no significant exception could be (or was) taken, but they clearly put the defendants on notice of the necessity for submitting appropriate requests for instructions to the jury if they wished to avoid the possibility of multiple punishments.

As we read them, none of the requests submitted by Roberts or Lawrence which were refused by the judge would have directed the jury to determine the actual number of underlying conspiracies, and each of them would have directed the jury to ignore the essential determinations of guilt or innocence with respect to each conspiracy which might have been found.[33] It strikes us that each of those requests was improperly designed to induce whole-

---

[33] The request now relied on by Roberts was as follows: "38. The existence of a conspiratorial agreement is a question of fact for the jury. If you the jury find as to a particular defendant, that less than the number of conspiracies existed than the number of counts in which he is charged with conspiracy and you are unable to find to a moral certainty on which counts, if any, the Commonwealth has proved a conspiratorial agreement and you are unable to eliminate the number of counts representing the difference between the number of conspiracies, if any, found by you and the number of counts on which the defendant is on trial, then you must find him not guilty on all counts." The requests now relied on by Lawrence were as follows: "1. If the jury finds that there was only one underlying conspiracy on all the counts, they must return a verdict of not guilty on all counts. 2. If the jury finds that there was only one underlying conspiracy in any so-called grouping of counts, they must return a verdict of not guilty on all counts within the grouping. 3. If the jury finds that the only difference between each specific count of an alleged conspiracy to forge, utter and steal is that the object and purpose of each count is different, then they must return verdicts of not guilty on all counts. 4. If the jury finds that within any of the so-called grouping of counts that the objects and purposes of each count within said grouping was the same, then you must find that within that grouping there was only one conspiracy and, therefore, your verdict must be not guilty as to all counts within said grouping." We have been unable to find that Benjamin submitted or purported to adopt a request similar to any of the foregoing. Nor did he, in connection with any of his motions to dismiss for fragmentation, ever request the judge to state his views on the actual number of conspiracies that might have been involved.

sale acquittals if the jury should be unable to reconcile the differences between the numbers of charges then being tried and the actual numbers of underlying conspiracies in which the respective defendants might have been involved. The requests might have been appropriate to raise questions of variance if there had been only a single charge of conspiracy against each defendant (compare the *Beneficial* case, 360 Mass. at 372), but they were not appropriate to the circumstances of these cases, in which there was at least one charge which covered each of the conspiracies the jury would have been warranted in finding. We see no error in the denial of any of the particular requests here discussed.

Finally, there was no exception taken to those portions of the charge actually given by the judge in which he directed the jury to determine the guilt or innocence of each defendant in the light of the evidence admitted against him on each particular count and to return a verdict of guilty or not guilty on each count against each defendant. Nor was any objection made or exception taken during the sentencing process.

Upon a consideration of the entire proceedings, we are unable to find that the defendants properly preserved any of the fragmentation questions which they now seek to argue.

4. *The motions to sever and the related motions for a mistrial.*[34] It is clear to us that many of the problems of duplicative counts and possible prejudice from misjoinder would have been avoided if the judge had exercised firm control from the outset and had insisted that the prosecution make an affirmative showing of the propriety of proceeding to trial on more than one count (or possibly one group of duplicative counts) at a time.[35] As already indi-

---

[34] The points considered in this part of our opinion are those raised by Roberts and Lawrence. Benjamin has consistently taken the position, which we reject, that the evidence did not warrant a finding that he participated in more than one conspiracy.

[35] It is possible that the judge's failure to take a stronger stand was the result of his placing too much emphasis on the language in *Benjamin (No. 1)* concerning the possibilities which might develop "at trial." See 358 Mass. at 675.

cated, the judge did not require any such showing, and there is no discernible basis for his pre-trial severance of sixty-two rather than some other number of counts. Accordingly, it now falls to us to review the proceedings in retrospect in order to determine whether there was a clear abuse of discretion in denying any of the motions for severance or any of the related motions for mistrial. See *Commonwealth* v. *Fancy*, 349 Mass. 196, 204 (1965) ; *Beneficial* case, 360 Mass. at 223-224; *Commonwealth* v. *Jervis*, 368 Mass. 638, 645-646 (1975). Contrast *Commonwealth* v. *Blow*, 362 Mass. 196, 200-201 (1972).

Before proceeding to any specific discussion, however, we think it appropriate to reiterate that there has never been a proper factual determination of the total number of conspiracies in which any of the defendants may have participated. In the present context, the significance of that hiatus is that although the evidence was properly susceptible of the interpretation that there were as many as sixteen separate conspiracies (see Appendix B), it could also have been found as a matter of fact that the actual number of conspiracies was relatively small. In other words, the fewer the actual number of conspiracies, the less was the chance of improper joinder and resulting prejudice.[36]

With one exception which we shall consider in the next part of this opinion, there is no contention that Roberts or Lawrence was in fact prejudiced by the failure to allow a greater measure of severance. Stripped of its verbiage, the basic contention is that the trial judge's persistent refusal to sever more counts[37] resulted in a trial of such

---

[36] Thus, if there were as few as three conspiracies (see n. 32, *supra*), it could not be said as matter of law that too many charges were tried together. See *Commonwealth* v. *Iannello*, 344 Mass. 723, 727-728 (1962). Reducing the problem to its simplest terms, if what might appear to be two conspiracies are in fact one, there can be no misjoinder and there is nothing to sever.

[37] In addition to the written motions filed by him, Roberts points to the denial of some fifty-four oral motions for further severance or for mistrial, or both, which were presented by him during the course of the trial. A review of the pertinent portions of the proceedings suggests that many of the oral motions may have been advanced with little purpose other than to secure reconsideration of adverse evidentiary rulings which had already been made and none of which has been argued to us.

length and complexity that there must necessarily have been accumulations of evidence as to particular offences which caused transferences of guilt from count to count or from defendant to defendant, or both. See *Commonwealth v. Blow,* 362 Mass. 196, 201 (1972); *Kotteakos* v. *United States,* 328 U. S. 750, 766-767, 772-775 (1946); *United States* v. *Varelli,* 407 F. 2d 735, 747 (7th Cir. 1969). Contrast *Blumenthal* v. *United States,* 332 U. S. 539, 559-560 (1947); *Beneficial* case, 360 Mass. at 221-224.

It cannot be denied that the trial was long (seventy-two days from venire to charge), but in a conspiracy case prejudice cannot be predicated solely on the length of trial. See the *Beneficial* case, 360 Mass. at 200-201; *United States* v. *Dardi,* 330 F. 2d 316, 329 (2d Cir. 1964), cert. den. sub nom. *Dardi* v. *United States,* 379 U. S. 845 (1964), sub nom. *Gravis* v. *United States,* 379 U. S. 869 (1964), and sub nom. *Berman* v. *Fay, Warden,* 381 U. S. 955 (1965). We do not believe the evidence was so complex as necessarily to result in confusion with respect thereto. Each of the items of documentary evidence sent to the jury was clearly and distinctively arranged and marked in such fashion as to advise the jury of (1) the judge's preliminary ruling concerning (a) the counts on which and (b) the defendants against whom the document had originally been admitted and (2) the expansionary ruling (if any) concerning the document's applicability to additional defendants which had subsequently been made at the conclusion of the prosecution's case. Compare the *Beneficial* case, 360 Mass. at 231, n. 12. Essentially the same course was followed with respect to each of the conversations in which various of the defendants were said to have participated[38]; the judge, in his charge, specifically instructed the jury to disregard the conversations if they should be unable to remember the conditions under which they had been admitted. Compare the *Beneficial* case, 360 Mass. at 370. We think the risk of confusion of defendants was more theoret-

---

[38] The number of such conversations does not appear to have exceeded the number encountered in the second trial in the *Beneficial* case. See 360 Mass. at 369.

ical than real; each defendant emerges from the evidence separate and distinct from the others and from Brousseau and Monroe, and the jury had ample opportunity to observe the distinctions during the more than forty days on which evidence was taken. That the jury did recognize and preserve such distinctions is evidenced to some extent by the fact that either Roberts or Lawrence was acquitted on some of the counts on which Benjamin was convicted.

We think the defendants have overlooked many of the factors commonly considered in determining the propriety of consolidation for trial. Here all the conspiracies but one resulted in thefts from the same corporate entity (FFC), by which four of the defendants had been employed and with which the fifth (Benjamin) had been closely associated. The principal means by which each theft was accomplished (the forgery of promissory notes and related documents) was the same in each instance, and the pattern of thievery was virtually identical in many of those instances. There were numerous and obvious coincidences and overlappings of dates and time spans with respect to the conspiracies which could have been found on the evidence. The principal witness to all the questionable transactions, and an active participant in most of them, was Brousseau. The testimony of the witness Sheehan was material to four of the conspiracies which could have been found.[39] The testimony of the witness McCarthy was material to questions of who had committed various of the forgeries not admitted to by Brousseau. In the circumstances, multiple trials would have resulted in additional expense and hardship to all concerned. Compare the *Beneficial* case, 360 Mass. at 223-224.

We think the defendants may also fail to appreciate that if these cases had gone to trial on a single count (or on a single group of duplicative counts) which was common to all the defendants and directed to a conspiracy later in time than some of the others, much of the evidence concerning earlier conspiracies might have been admissible as

[39] Numbers 4, 9, 10 and 12 on Appendix B.

part of the background of the later conspiracy. See *Commonwealth* v. *Beal,* 314 Mass. 210, 227 (1943); *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50 (1965).

On a review of the entire proceedings we are not persuaded that the judge committed a clear abuse of discretion in refusing to allow a greater measure of severance.

5. *Lawrence's motion to limit his testimony.* At the conclusion of the prosecution's case Lawrence filed a motion which, at first blush, appeared to present a problem somewhat akin to those just discussed. The motion, which was denied, was that Lawrence "be allowed to limit his testimony and the Commonwealth's cross examination to the ... specified separate and distinct conspiracies ... enumerated in" eighteen designated counts. Lawrence chose not to testify and now argues that the denial of that motion effectively deprived him of his right to testify concerning (and to limit his testimony to) the charges embraced within the counts designated in the motion and to remain silent as to other counts. See *Cross* v. *United States,* 335 F. 2d 987 (D. C. Cir. 1964).

The argument is superficially appealing, but it lacks substance in the circumstances. The counts specifically enumerated in the motion were all the eighteen counts against Lawrence which were ultimately submitted to the jury, and it is clear from the argument at the hearing on the motion that its true purpose was to prevent any proposed testimony from being used against Lawrence at any future trial of the counts which had already been severed as to him or in any future trial of other pending indictments included in the welter referred to at the outset of this opinion. The substance of the proposed testimony was not disclosed, and the motion was not unqualifiedly denied. The judge specifically advised Lawrence that if he were to testify in this case, both his direct and cross examination would be limited to matters material to the counts then on trial. He left to Lawrence the choice whether to testify under those conditions. All the judge actually refused to do was make a blanket ruling in advance with respect to the use which might be made of the proposed testimony

on the occasion of some future trial.[40] We think the rulings made and refused were entirely correct.

*6. Lawrence's motions for directed verdicts.* At the close of the prosecution's case Lawrence presented motions for directed verdicts on all the counts which had not been severed as to him. Some of those motions were allowed (see n. 14, *supra*), and some were denied. Lawrence now pursues his exceptions to the denial of those of his motions which were directed to the particular counts which embraced the conspiracies concerning the so-called "breakdown loans" and the so-called "67,000 share purchase" of FFC common stock by the Paul E. Sheehan Trust.[41] Before proceeding to a discussion of the evidence relevant to either conspiracy it will be helpful to summarize certain of the background evidence concerning the loci and dramatis personae which was admitted generally on all the counts not severed.

In 1961 FFC (then known as Spindle City Finance Company) had only one office, which was located in Lowell. That year FFC hired Lawrence as its executive vice president. Lawrence was given charge of the whole corporation and had "absolute control to go ahead and project" FFC. However, he delegated much of the "internal management" of FFC to others and concentrated instead on the expansion of FFC. His primary duties were "to negotiate large loans ... from the large lenders [in order to obtain capital for the expansion]; and, overall, the complete function of

---

[40] The judge had the following to say, among other things: "I am not making any advance rulings in this regard. If the defendant takes the stand, he will take it under the ordinary rules by which any defendant takes the stand in a criminal case. I will make no advance rulings.... We will just try *this* case. Any inquiry by you or by ... [the prosecutor] on matters not material to this case will be excluded. That's all I can tell you.... I don't have to make any advance rulings. I will deny ... [the motion] without prejudice. I will take it up when confronted with specific questions on direct and cross examination" (emphasis supplied).

[41] The conspiracies in question are those numbered 1 and 10 on Appendix B. On the evidence, each of those conspiracies was separate and distinct from the other as well as from each of the other conspiracies which could have been found.

... [FFC] on an executive level, rather than on ... day-to-day chores that the managers would do."

In the years immediately following the hiring of Lawrence FFC acquired or created approximately twenty branch offices (see n. 10, *supra*) located in Massachusetts and three of the other New England States, with the first acquisition taking place in 1961. In 1961 Lawrence hired Roberts, with whom he had previously worked at two other finance companies. Also in 1961 either Lawrence or Roberts hired Brousseau. Roberts first worked as the Lowell office manager; Brousseau worked under Roberts, originally in connection with delinquent accounts and later as the assistant office manager in Lowell. In early 1964 Roberts moved up to a position as supervisor of certain branch managers.

Benjamin never worked for FFC, but he was a friend of Lawrence and had previously worked with him at another finance company. Benjamin had two finance companies of his own, was a substantial borrower from FFC, and was a director of and a substantial stockholder in a bank in which FFC maintained a checking account.

In October of 1964 FFC opened an office on the second floor of a building in Chelmsford. FFC's executive offices were located there; they included a conference room, a bookkeeping office, and offices for both Roberts and Lawrence, the former then moving up to the position of assistant treasurer of FFC. The company's executive books and records were kept in that office, but the books and records of the branches were kept in the branches.[42]

Also located in the Chelmsford building was a loan office which originally shared the same floor with the executive offices but was later moved to a room on the first floor of the building. That office never had a "small loans" license to do business in loans of $3,000 or less, and it received no

---

[42] In 1965 FFC began using a computer for record keeping, which resulted in all the figures from the branches being available in a central location. However, the branches continued to keep paper records in their respective offices.

Commonwealth *v.* Benjamin.

business "from the street"; when it opened, larger loans from other branches were transferred to it. Brousseau was named manager of the loan office; his workload was light, and he spent a significant amount of his time in the executive office, mostly having "discussions" with Roberts.

Although Lawrence had an office in the Chelmsford building, he also had another office at the foot of Milk Street in Boston as early as July, 1964, and continuously thereafter throughout the time under consideration. Lawrence appears to have spent the bulk of his time in the Boston office, visiting Chelmsford only three or four times a month. He had almost daily telephone conversations with Roberts. In the early part of 1966 Brousseau became an administrative assistant to Roberts and an internal auditor of FFC; in those positions he worked primarily for Roberts. "I would do the running for ... [Roberts]. I was sort of just like his runner."

*a. The breakdown loans.*[43] In June of 1964 a group of participating insurance companies agreed to lend FFC approximately $7,000,000. The loan was conditioned, among other things, on FFC's agreement that not more than five per cent of the aggregate of its outstanding loans would be in amounts totalling more than $15,000 each. In a late September, 1964, conversation at the Lowell office Roberts informed Brousseau that FFC was in violation of that agreement and that at least some of its loans totalling more than $15,000 would have to be broken down into smaller loans. In early October, at about the time those loans were transferred to the new Chelmsford office, Benjamin, Roberts and Brousseau met to discuss the problem further. Roberts showed the others a list of six loans which were to be broken down. The six consisted of three loans to Benjamin aggregating $102,213.75, a loan to Rosenberg of $32,000, a loan to Sharrio of $28,840, and a loan to Tanger of $50,000. Those loans had apparently been made between June of 1963 and September of 1964. Rosenberg, Tanger

---

[43] So far as Lawrence is concerned, the material counts are those numbered 3, 4, 5, 7, 8, 9, 10 and 12.

and Sharrio had all obtained their loans through Benjamin or Roberts, or both. Numerous conversations followed between Roberts and Brousseau at the Chelmsford office; Benjamin and Brousseau also spoke with each other by telephone. The end result of those conversations was the breaking down of the six original loans into seventeen new and fictitious loans, each supposedly evidenced by a forged promissory note payable to the order of FFC in an amount less than $15,000. Benjamin supplied some of the forgeries. Brousseau supplied the balance, using names supplied by himself or by Benjamin or Roberts. Brousseau forged application forms for the loans (inventing the necessary information himself) and also forged related ledger cards (which he thereafter kept updated) which purported to show running balances due on the fictitious loans. He crossed the genuine loans off the Chelmsford loan register book and entered the fictitious loans in close proximity to them. He placed the genuine notes in a separate folder and kept them in his possession or under his control until some time in 1967. The forged documents were kept with the other Chelmsford branch records.

In late January, 1965, Robert Boyer, a partner in a firm of certified public accountants working for FFC, and one of his assistants had a talk with Lawrence at his Boston office. They asked Lawrence whether he thought FFC, in its forthcoming annual report for the year just ended, would appear as being in default of any of the covenants it had made with respect to the loan from the insurance companies. Lawrence said in substance that he did not think so, and "that there are several loans that have been made that were in the name of persons who were acting as nominees for others, and that these loans should not be considered as being over $15,000 . . . since each individual debt was less than" that amount. Boyer asked for documentation. About two weeks later Boyer received (from whom does not appear) copies of the forged notes, together with four so-called "nominee letters." Benjamin, Sharrio, Rosenberg and Tanger had each signed one of those letters, all of which read: "To whom it may concern: Please be

advised that I was acting as a nominee for the benefit of the following people in the following amounts: [The relevant forged notes were then listed.] These persons are individually indebted to you. Kindly substitute the enclosed note for the ones I signed to properly reflect the transaction. Very truly yours, [signature]."

In early March, 1967, Stanley Hart of the independent accounting firm of Touche Ross & Co. (Touche), which also did work for FFC, requested a meeting with FFC personnel to discuss certain irregularities he had uncovered in the Pelham branch. Roberts, Lawrence and Brousseau met with Hart. Hart told them that duplicate bank deposit slips indicated that a number of payments on loans which the branch's cash receipts book showed as having been made by the borrowers had in fact been made by other persons, including Brousseau. Roberts and Brousseau gave possible explanations. Lawrence does not appear to have said anything on this occasion. Approximately a week later Hart, Roberts, Lawrence and Brousseau met at Pelham to discuss the matter further. After some discussion the group adjourned to Chelmsford. Lawrence took Hart aside and told him that FFC "had from time to time lent money to individuals in excess of what the company was allowed to lend; and that when they did this, the loan may be made to another person. However, that they did this only when the second person was a responsible individual and would qualify for the loan."

We are of the opinion that the judge erred in not allowing Lawrence's motions for directed verdicts on the counts directed to the breakdown loans. There was no evidence which placed Lawrence at any of the conversations at which the breakdowns were originally discussed or conceived; nor was there any evidence that he did anything to assist Brousseau in the creation of the fictitious loans. There was nothing to indicate that Lawrence and Roberts ever discussed the breakdown loans in any of their daily telephone conversations. Indeed, there was no evidence that Lawrence was even aware of the original loans or of their

becoming in violation of the supervening lending restriction. The prosecution concedes that there was no direct evidence that Lawrence participated or acquiesced in the breakdown loans. It argues from the fact that Lawrence was the executive vice president of FFC with over all charge of the company that he must be taken to have known and approved of the breakdowns. But Lawrence worked mainly in Boston and concerned himself more with the expansion of the company than with its day-to-day operations. The conspiracy took place largely (if not exclusively) in Chelmsford, and all the records which might have revealed the existence of the conspiracy were kept there. In the circumstances, we think the inference contended for is not a permissible one. *Commonwealth* v. *Anthony,* 306 Mass. 470, 478-480 (1940). Contrast *Commonwealth* v. *Beal,* 314 Mass. 210, 223 (1943).

The prosecution's case is not strengthened by Lawrence's actions with regard to the nominee letters in 1965 or by his statements to Hart in 1967. Lawrence may have believed (if he ever saw them) that the nominee letters were legitimate, just as Boyer apparently did. Even if Lawrence's statements to Hart could be construed as expressing knowledge of the conspiracy, they were made over two years after the conspiracy had run its course, and they did not show that Lawrence was aware of it while it was in progress. Lawrence could just as easily have discovered the conspiracy after it had come to an end, perhaps even in the week between his two conversations with Hart.

It is true that a conspiracy must ordinarily be proved by circumstantial evidence. *Commonwealth* v. *David,* 335 Mass. 686, 695 (1957). However, on the foregoing evidence it is just as reasonable to infer that Lawrence neither participated in nor was aware of the conspiracy as it is to infer that he did participate or affirmatively acquiesce. See the *Beneficial* case, 360 Mass. at 249-250. In our view Lawrence's guilt has not been established. *Commonwealth* v. *David,* 335 Mass. at 695-696. *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965).

*b. The 67,000 share purchase.*[44] In March of 1965 an insurance company purchased 5,000 shares of FFC preferred stock for $500,000. As part of the relevant purchase and sale agreement certain restrictions were placed upon the payment of dividends to holders of FFC common stock. One of those restrictions was that no dividend of more than $.20 per share per year could be paid until FFC's "net asset coverage" should reach 415 per cent of the aggregate par value of the preferred stock. The purchase and sale agreement also provided that by April 1 of each year Touche should certify FFC's compliance with the restriction as of the end of the preceding December.

In 1965 FFC declared a dividend of $.25 which violated the restriction. Early in 1966, in Lawrence's Boston office, Hart informed Lawrence of the violation. Also present were FFC's lawyer and an assistant to Lawrence. The four discussed possible ways of curing the violation, including the repayment of the excessive portion of the dividend by the directors (to which Lawrence objected) and an increase in the net worth of the company. Although there is no evidence that any specific figures were discussed on that particular occasion, it will be helpful to an understanding of what follows to know that the increase in the net worth of the company necessary to cure the dividend violation was $288,000.

In January Lawrence met in Nashua, New Hampshire, with Roberts and a Mr. Paul E. Sheehan. Sheehan was a lawyer who, at the direction of Roberts, Lawrence and Brousseau had, in March of 1964, created a Massachusetts business trust to take legal title to FFC stock which all four had earlier purchased with borrowed money. The trust was formally known as the Paul E. Sheehan Trust, and its original subscribers had been the four just named and a William McDermott. Benjamin became a subscriber in mid-1964. The original trustees had been Sheehan and McDermott, with five others (including Roberts and Brousseau) later becoming trustees.

---

[44] The material counts are those numbered 64, 65 and 115.

At the Nashua meeting Lawrence told Roberts and Sheehan that he had discussed with the FFC board of directors the possibility of FFC's selling 70,000 shares of its common stock to the Sheehan Trust at the price of $9 a share, or a total of $630,000. Roberts noted that such a purchase would give the trust close to a working majority of the FFC stock. Sheehan expressed some concern about the price but said that he would talk to a Mr. Nugent at the Indian Head National Bank in Nashua to inquire whether that bank would help finance the purchase.

Sheehan, Roberts and (possibly) Brousseau took part in the ensuing negotiations with Nugent. Some time between late February and late March Nugent informed Sheehan that the bank would lend the trust $380,000, the maximum allowed by law in the circumstances, but that the money would not be available until after April 1.

At some point in late March or early April Benjamin, Roberts, Lawrence, Brousseau, Sheehan and others met in Lawrence's Boston office to discuss what to do. Lawrence asked Sheehan if the trust would make the purchase. Sheehan replied that he was against the purchase, that the trust did not have sufficient subscribers even to pay off what it had already borrowed to make earlier purchases, that he understood the major purpose of this purchase to be to cure a violation of the dividend restriction, and that he believed that instead of the trust's purchasing $630,000 in stock, the directors should repay the excessive portion of the dividend. Lawrence said no dividend had been paid in violation of the restriction. Sheehan expressed disbelief, and the meeting broke up. Roberts, Brousseau and Sheehan drove home together; Sheehan repeated his opposition to the purchase and received the impression that Roberts and Brousseau agreed with him.

The next day, either at Benjamin's Boston office or at Lawrence's, Benjamin, Roberts, Lawrence, Brousseau, Sheehan and others met again. Sheehan again argued that the trust could not afford the purchase. Lawrence noted that the trust need not buy 70,000 shares and suggested it buy only 67,000, which would have the effect of reducing

the total purchase price to $603,000. Sheehan said he did not think the suggestion would make much difference. In Sheehan's version of the meeting, Lawrence said to Sheehan, "You already made a moral commitment for this purchase and you have arranged the financing. You should go through with it," and Sheehan replied that if he had made a moral commitment, he would honor it. In Brousseau's version, Lawrence told Sheehan that the trust had to buy the stock in order to cure the violation, and Sheehan replied that he might as well "go along" because the other trustees would outvote him. In both versions, Benjamin said that he would raise the balance of the money necessary to make the purchase.

Roberts and Brousseau drove home from that meeting together. Roberts told Brousseau that he had spoken with Benjamin about raising the additional money and that Benjamin had mentioned that he would need some help. Brousseau mentioned a bank from which he hoped they might get the money. Roberts said that if they could not get it there within the necessary time, they would have to get it from FFC, at least on a temporary basis.

When the bank in question proved unwilling or unable to lend the money, Brousseau, under the supervision of Roberts, proceeded to "get the money out of" FFC. They proceeded to raise the full $288,000 needed to cure the violation rather than just the $223,000 difference between the anticipated $380,000 loan from the Indian Head Bank and the $603,000 purchase price. The reason for doing so is somewhat obscure. Brousseau testified that at the climactic meeting in Boston already described Lawrence had stated that a minimum of $288,000 was needed to cure FFC's violation. Brousseau also testified that Lawrence had mentioned to him the need for $288,000 in the course of a brief telephone conversation, but Brousseau gave no details concerning when such conversation had taken place or exactly what had been said. As will appear later, the $288,000 raised by Roberts and Brousseau was used, the day before the proceeds of the Indian Head loan were received, to purchase enough FFC stock to cure the divi-

dend violation. It would seem, therefore, that Roberts and Brousseau raised the full $288,000 in order to cure the violation as soon as possible and thus avoid any further delay in the Touche certification concerning the dividend restriction.

Roberts and Brousseau raised a portion of the $288,000 by creating twelve fictitious loans totalling $49,033. By April 18 Roberts and Brousseau had obtained all but about $22,000 of the $288,000. On or about that day Roberts, Lawrence, Sheehan and others met in the Chelmsford office. Roberts told the group that Benjamin had raised all but $22,000 of the down payment, and someone asked Sheehan if he knew of a way to raise the $22,000. Sheehan offered to put up certain notes receivable of a company owned by him (J&W Investment Co.) as collateral security if someone could arrange a loan. Roberts said, "Fine. We will arrange it." Following the meeting Roberts sent Brousseau to Sheehan's office to pick up the notes receivable. Sheehan endorsed the notes over to FFC; Brousseau and Sheehan then exchanged checks, Sheehan receiving two FFC checks for a total of $22,000 and Brousseau receiving two J&W checks for a like total drawn payable to the order of the Sheehan Trust.

Brousseau had placed the $288,000, as he raised it, in a checking account opened by him in the name of the Sheehan Trust, but without Sheehan's knowledge.[45] On April 18 Brousseau went to Sheehan's office and gave him three checks totalling $288,000 drawn against that account and payable to the order of the Sheehan Trust. Sheehan had someone deposit those checks in another Sheehan Trust checking account; he then drew a check of the trust for $288,000 payable to the order of FFC.[46] For some unexplained reason, Sheehan backdated the trust's check to April 15; it was used the same day to purchase 32,000

---

[45] The account was opened in the bank previously referred to as the one in which Benjamin had a substantial interest.

[46] Brousseau gave a somewhat different account of the check shuffling process.

of the 67,000 shares of FFC stock and so cure the dividend violation.

The following day, April 19, the Indian Head Bank wired the proceeds of the $380,000 loan to the Sheehan Trust bank account which had not been opened by Brousseau. Of that sum $315,000 was used to complete the 67,000 share purchase.

On or about April 20 Sheehan gave Brousseau a check for the remaining $65,000, payable to either Brousseau or Benjamin. In the rush to raise the $288,000 Brousseau had persuaded an employee of FFC to write a check for $60,000 drawn on the employee's personal checking account. Accordingly, Brousseau next caused separate $30,000 "suspense" checks, payable to the order of the employee, to be drawn against the Chelmsford and Nashua branches of FFC. He then covered those two suspense checks with $60,000 of the $65,000 given him by Sheehan. He used another $4,000 to pay off one of the loans he had created to make up the $288,000, and the remaining $1,000 was spread over delinquent loans at the Pelham branch.

On April 18, immediately after the purchase of the first 32,000 shares for $288,000, FFC's 1965 annual report was issued with a notation by Touche that the $288,000 sale had placed FFC in compliance with the dividend restriction. Sheehan received a copy. He saw the notation and, on April 25, confronted Lawrence in the latter's Chelmsford office. Sheehan said, "I thought you told me that the ... last dividend which was declared was not in violation of the insurance agreements." Lawrence denied any violation. Sheehan pointed to the notation and said, " 'Well, what does this say?' And ... [Lawrence] just shook his head. He didn't answer."

On May 20, 1966, Boyer sent Lawrence a letter informing him of certain irregularities he had uncovered in auditing the Chelmsford office. Included among the transactions discussed were some of those by which the $288,000 had been raised. For example, Boyer listed four checks purporting to represent disbursements of money to FFC borrowers and stated that he could find no corresponding promissory

notes signed by borrowers. Boyer also noted that "perhaps coincidentally" a "deposit of April 20, 1966 ... includes checks in these amounts drawn on our bank."[47] In the course of a telephone conversation with him in July of 1966 Boyer asked Lawrence what he had done with respect to that letter. Lawrence replied that he was looking into it.

On August 16 Boyer wrote another letter to Lawrence in which he noted, with respect to one of the fictitious loans created by Brousseau in raising the $288,000, that the borrower had not yet made his first payment on the loan, that no effort to collect payment had been made, and that he (Boyer) could not find the application for the loan or any record of a credit investigation. Boyer received no response to that letter from Lawrence.

We are of the opinion that the judge should also have allowed Lawrence's motions for directed verdicts on the counts relating to the Sheehan Trust's purchase of 67,000 shares of FFC stock. Lawrence appears to have been the prime instigator of the purchase, but the evidence does not establish that he participated in, or that he was even aware of, any of the illegal activities involved in raising the $288,000. During the Boston meeting at which it was finally decided to purchase the stock, Benjamin said he would raise the necessary additional money. Lawrence could have believed Benjamin would do so by legitimate means. Lawrence's request that Benjamin raise the full $288,000 to cure the dividend violation rather than the $223,000 difference between the purchase price and the anticipated Indian Head loan does not show participation in the conspiracy; there was nothing unlawful in Lawrence's desire to have the dividend violation cured before the Sheehan Trust should receive the proceeds of that loan and be in a position to complete the 67,000 share purchase.

The necessity for raising part of the $288,000 illegally did not become apparent until at least several days after the Boston meeting, and there is no evidence that Lawrence

---

[47] At least four checks had been drawn by Brousseau in the course of raising the $288,000.

was present on any occasion when that necessity was discussed. Lawrence took no part in raising the $288,000 until the Chelmsford meeting at which Sheehan was asked if he would help raise the final $22,000. Nothing that occurred at that meeting established Lawrence's participation in a conspiracy. Roberts said no more than that Benjamin had raised all but $22,000 of the $288,000, and an apparently legal method of raising the $22,000 was arranged. Brousseau's testimony concerning a brief telephone conversation during which Lawrence mentioned the figure $288,000 does not help the prosecution's case; there was no evidence of the context in which that figure was mentioned.

Nor was there any evidence of any general backdrop of prior dealings between or among Lawrence and any of the other defendants (or Brousseau) from which it could have been inferred that Lawrence knew or should have known that any part of the $288,000 was to be raised, not by Benjamin through legitimate means, but by Roberts and Brousseau through illegal means. Compare *Commonwealth* v. *Nelson, ante,* 90, 96-97 (1975), further appellate review granted, 367 Mass. 912 (1975). Although there was evidence sufficient to warrant a finding that Lawrence participated with Roberts and Brousseau in another conspiracy which was contemporaneous with the 67,000 share purchase, the prosecution did not attempt to have such evidence admitted as background evidence (or otherwise) on the counts of the indictment which were directed to the purchase in question.[48]

Lawrence's reactions (or lack thereof) to Boyer's letters concerning irregularities in the Chelmsford office and his possible attempt to mislead Sheehan as to the reasons for making the stock purchase may have been "seriously suspicious," but, even when taken in connection with all the other evidence, they do not provide the proof necessary to warrant a finding of guilt. *Commonwealth* v. *David,* 335

---

[48] There was no evidence implicating Lawrence in a conspiracy with Benjamin prior to or simultaneous with the stock purchase here in question.

Mass. 686, 696 (1957). See also *Commonwealth* v. *Fancy*, 349 Mass. 196, 201 (1965). Lawrence did not receive either letter until after the conspiracy had come to an end, and there is no evidence of what, if anything, Roberts or Brousseau may have told him concerning the matters inquired of in either letter.[49] The argument that because Lawrence was executive vice president of FFC the conspiracy could not have occurred without his knowledge and acquiescence has already been disposed of in our consideration of the breakdown loans. We are again confronted with a situation in which the evidence was as consistent with innocence as with guilt. The judge should have allowed the motions for directed verdicts. See *Commonwealth* v. *Anthony*, 306 Mass. 470, 478-480 (1940); *Commonwealth* v. *David*, 335 Mass. at 695-696. Contrast *Commonwealth* v. *Beal*, 314 Mass. 210, 221-224 (1943); *Commonwealth* v. *Kelley*, 359 Mass. 77, 90-92 (1971).

7. *The newspaper article.* The trial was conducted in Lowell. On the first day, before the jury were selected and out of the hearing of the venire, Brousseau pleaded guilty to all sixty counts. As soon as the jury were selected, the judge forcefully instructed them not to consider newspaper or other media accounts of the trial and to "confine your consideration exclusively to what you hear within this courtroom." During the evening of the first day an article appeared in a Lowell newspaper which stated, among other things, that "Brousseau and four other defendants pleaded guilty when originally indicted in 1968." When the article was brought to the judge's attention on the morning of the second day he refused to poll the jurors concerning the article or to declare a mistrial because of anything found therein. Instead, he reminded the jury of his instructions of the previous day, told them the article "contained a number of very serious errors of fact," and stated "as categorically as I can, that none of the four defendants on trial here before you has ever taken any position other than the

---

[49] It should be noted that neither letter accused Lawrence of any personal knowledge or wrongdoing.

fact that they are not guilty of all charges which are made against them. That has been their position from the very beginning, and it is still their position at this point." It was discretionary with the judge whether he would poll the jurors (*Commonwealth* v. *Balakin,* 356 Mass. 547, 554 [1969]) or declare a mistrial (*Commonwealth* v. *Bartoloni,* 2 Mass. App. Ct. 152, 157 [1974], and cases cited).

The only other significant matter reported in the article which the jury were not later to see or hear in the courtroom during the course of the trial (see *Commonwealth* v. *Balakin,* 356 Mass. 547, 554 [1969]; *Commonwealth* v. *Bartoloni,* 2 Mass. App. Ct. 152, 157-158 [1974]; contrast *Commonwealth* v. *Crehan,* 345 Mass. 609, 614 [1963]) was the fact that Brousseau had pleaded guilty. The jury could have inferred Brousseau's guilt from his own testimony. See *Commonwealth* v. *French,* 357 Mass. 356, 400 (1970).

We find no due process (see *Murphy* v. *Florida,* 421 U. S. 794 [1975]) or other ground for reversal in the judge's treatment of the newspaper article.

*8.* Other questions of lesser importance are considered in Appendix C hereof.

The exceptions of Benjamin (indictment no. 81776) and Roberts (indictment no. 81788) are overruled. The exceptions of Lawrence to the denial of his motions for directed verdicts on counts 3, 4, 5, 7, 8, 9, 10, 12, 64, 65, and 115 of indictment 81797 are sustained; the judgments on those counts are reversed, the jury verdicts are set aside, and judgments are to be entered for the defendant; the other exceptions on that indictment are overruled.

*So ordered.*

Commonwealth *v.* Benjamin.

APPENDIX A.

1. The time of the alleged offense?
1. Between the dates of September 1, 1964 through October 20, 1968.
2. The place of the alleged offense?
2. Lowell, Chelmsford, Wakefield, Wilmington, and other places which, at the present time, are either unknown or are in doubt.
3. The manner in which the offense was committed?
3. As relates to this count, the defendants conspired to create a fictitious loan in the name of

Samuel Askerayz

The conspiracy was accomplished in the following manner: The First Finance Corp. was a finance company which had grown from one office to some twenty offices and subsidiaries; had as its employees Robert C. Lawrence, Executive Vice-President and director who managed the company, Edward Roberts, Assistant Treasurer and director who was also in a managerial capacity, Paul Brousseau, employed in varying capacities advanced to the position of internal auditor and assistant to Edward Roberts, and Claire Monroe, personal secretary to Edward Roberts. Carl Benjamin, who was one of the company's largest borrowers, was the owner of two finance companies, known as Old Colony Credit Co., Inc. and Northern Credit Company, Inc. He was also a large stockholder, director, and member of the Executive Committee of the Commercial Bank and Trust Company of Wilmington, Mass.

The First Finance Corp. had experienced a phenomenal growth during the first few years of the 1960's and as part of the growth the company had to borrow large sums of money, running into millions of dollars, from large insurance companies and banks. As part of the borrowing agreements from these insurance companies and as part of the consideration for borrowing the money, First Finance Corp. agreed to comply with many restrictions, one of which was a limitation on loans over $15,000.

At the time of these agreements, there were loans on the books of First Finance Corp. standing in the name of Carl Benjamin totaling $102,213.75 and another loan standing in the name of A. Joseph Rosenberg, otherwise known as Aaron J. Rosenberg, a business associate of Carl Benjamin, in the amount of $32,000, a loan in the name of Arthur A. Tanger, another business associate of Carl Benjamin, in the amount of $50,000, and another loan in the name of William J. Sharrio, Carl Benjamin's accountant, in the amount of $28,000.

A conspiracy then arose among and between Robert C. Lawrence, Edward Roberts, Carl Benjamin, Paul Brousseau, and Claire Monroe to break down these loans into smaller loans of less than $15,000 each and into names other than the original names. They then proceeded to create fictitious loans in amounts of less than $15,000 on the books and records of the company using names of friends, relatives, business associates, neighbors, neighbors of friends, and fictitious names. They first created promissory notes in these names to the company and signed with forged signatures, then they caused the books and records of the company to reflect that the larger loans were paid out and that the newer, smaller fictitious loans were legitimate new loans. These and other fictitious loans came to be known as "Q" loans.

Commonwealth *v.* Benjamin.

APPENDIX A (*Cont.*).

A further conspiracy of the defendants was to create fictitious loans, notes, and checks for the purpose of clearing so called "suspense" items on the books of the company. A suspense item is an entry on the books of the company indicating a payment made by the company with no full explanation of what the money was used for and so it remains in "suspense" until it is either cleared or placed in the proper category of expenditure on the books of the company. Some of the moneys obtained from these suspense items were used for the purposes of the defendants and cleared by fictitious loans.

The conspiracy to create more fictitious loans was done for other purposes, one of which was so that the Paul E. Sheehan Trust could purchase shares of stock in First Finance Corp. The defendants were involved with others in the Paul E. Sheehan Trust. One of the main purposes for creating the trust was to purchase First Finance Corp. shares of stock and ultimately to take control of the company. Each large purchase of First Finance Corp. stock by the Paul E. Sheehan Trust was accomplished with the use of borrowed money from banks, but since the Paul E. Sheehan Trust could not borrow more than 75% or 80% of the purchase price of the stock, since the stock was used as security for the loan, a down payment of 20% to 25% had to be raised elsewhere for the purchase of the stock. As part of the conspiracy, the defendants provided some of the down payments directly or indirectly from moneys obtained from the creation of more fictitious or "Q" loans in First Finance Corp.

Another conspiracy occurred among the defendants as a result of the progressive increase of moneys borrowed from First Finance (Appendix A continues on page 645.)

APPENDIX B.

| (1)<br>Con-<br>spiracy<br>no. | (2)<br>Apparent<br>immediate<br>objective(s) | (3)<br>Approxi-<br>mate<br>date(s) of<br>overt act(s) | (4)<br>Conspirators<br>implicated<br>by evidence* | (5)<br>Immediate<br>recipient(s)<br>of proceeds<br>of theft |
|---|---|---|---|---|
| 1 | Conceal loans proper when made but which subsequently became in violation of supervening insurance company lending restriction | 10-7-64 to 12-28-64 | Be, R, Br, M** | No theft |
| 2 | Loan to Be | 12-29-64 | Be, R, Br | Be |
| 3 | Clear questionable items from executive suspense account | 12-30-64 | R, Br | No immediate theft |

Commonwealth *v.* Benjamin.

APPENDIX A *(Cont.)*.

Corp. by Carl Benjamin and his two finance companies. All of these loans were done by means of fictitiously created loans.

Another conspiracy occurred among the defendants whereby fictitious loans were created to purchase a liquor store called the John Gilbert Jr., Company.

Conspiracies occurred among the defendants in such a manner that fictitious loans were created in groups so that some of the proceeds were used for more than one purpose, that is, the proceeds from any one group was used partly for the foregoing reasons, and partly for other entities known as North Eastern Acceptance Corp., Advertising Concepts, and the Hillery Building.

Finally, the defendants conspired to create fictitious loans for the purpose of spreading payments on already existing fictitious loans so that they would not appear on the books of the company as being in arrears.

4. The means employed to commit the alleged offense?

4. [Denied by the court.]

5. The name or names of persons other than the Defendant allegedly present during the commission of the offense?

5. All of the co-defendants were present or constructively present at one stage or another of the conspiracy. Some stages of the conspiracy involved no physical presence but some form of communication. As to whether or not any particular co-defendant was present at any particular stage of the conspiracy, the evidence will show that he or she was present, or there will be evidence from which the jury can infer presence of that co-defendant.

| *(6)* *Approximate immediate amount of proceeds* | *(7)* *Count number(s) corresponding to date(s) of overt act(s)* | *(8)* *Found guilty\*\*\** | *(9)* *Conspiracy included in first sentence term* | *(10)* *Conspiracy included in second sentence term* | *(11)* *Conspiracy included in third sentence term* |
|---|---|---|---|---|---|
| None | 3,4,5,7,8, 9,10,12,16, 17 | Be and R (all 10 counts); L (all counts except 16,17); M (counts 7,8,12, 16,17) | L | | Be, R |
| $29,000 | 19,20 | Be, R | Be, R | | |
| None | 21 | R | R | | |

Commonwealth *v.* Benjamin.

APPENDIX B (*Cont.*).

| (1)<br>Con-<br>spiracy<br>no. | (2)<br>Apparent<br>immediate<br>objective(s) | (3)<br>Approxi-<br>mate<br>date(s) of<br>overt act(s) | (4)<br>Conspirators<br>implicated<br>by evidence* | (5)<br>Immediate<br>recipient(s)<br>of proceeds<br>of theft |
|---|---|---|---|---|
| 4 | Facilitate purchase of FFC stock by Sheehan Trust | 3-24-65 | R, L, Br | Be, R, L, Br, Sheehan and others |
| 5 | Loan to Be | 4-5-65 | Be, R, Br | Be |
| 6 | Conceal delinquent loans; clear questionable items from executive suspense account; payment of R bank loan | 12-2-65 | R, Br | R (in part) |
| 7 | Loan to Be | 12-27-65 | Be, R, Br | Be |
| 8 | Clear questionable items from executive suspense account | 12-29-65 | R, Br | No immediate theft |
| 9 | Sale to Northeast Acceptance Corporation (NEAC) of loans held in violation of insurance company lending restriction | 4-4-66 | R, L, Br | R, L, Br, Sheehan |
| 10 | Conceal violation of insurance company dividend restriction; facilitate purchase of FFC stock by Sheehan Trust | 4-15-66 | Be, R, Br | Be, R, L, Br, Sheehan and others |
| 11 | Purchase of FFC stock held by Scolnick | 4-27-66 | R, Br | R, Br |
| 12 | Conceal violation of insurance company lending restriction; loan (?) to NEAC | 7-27-66 | R, L | R, L, Br, Sheehan |

Commonwealth *v.* Benjamin.

| (6) Approximate immediate amount of proceeds | (7) Count number(s) corresponding to date(s) of overt act(s) | (8) Found guilty*** | (9) Conspiracy included in first sentence term | (10) Conspiracy included in second sentence term | (11) Conspiracy included in third sentence term |
|---|---|---|---|---|---|
| $50,000 | 26 | R | R | | |
| $20,000 | 27,28 | Be, R | Be, R | | |
| Not disclosed | 34,35,36 | R | R | | |
| $25,000 | 38 | Be, R | Be, R | | |
| None | 42 | R | R | | |
| $83,000 | 58 | R, L | L | R | |
| $223,000 (net) | 64,65,115 | Be, R, L | | L | Be, R |
| $4,400 | 66 | R | | R | |
| $3,000 (?) | 75 | R, L | | R | L |

Commonwealth *v.* Benjamin.

APPENDIX B *(Cont.).*

| *(1)* Con-spiracy no. | *(2)* Apparent immediate objective(s) | *(3)* Approxi-mate date(s) of overt act(s) | *(4)* Conspirators implicated by evidence* | *(5)* Immediate recipient(s) of proceeds of theft |
|---|---|---|---|---|
| 13 | Loan to Be | 10-3-66 to 11-7-66 | Be, R, Br, M | Be, R, Br |
| 14 | Conceal violation of insurance com-pany lending re-striction; loan (?) to Old Colony Credit Company | 1-11-67 to 1-12-67 | Be, R, L | Be |
| 15 | Loan to Be | 1-16-67 | Be, R, Br, M | Be |
| 16 | Purchase of FFC stock held by Cloutier | 1-16-67 | R, Br | R or Br |

   * Either as originally limited or as subsequently expanded in certain instances.
  ** "Be" is Benjamin; "R" is Roberts; "L" is Lawrence; "Br" is Brousseau; and "M" is Monroe.
 *** Brousseau pleaded guilty to each count on which any defendant was found guilty.

APPENDIX C.

C-1.  Assuming (which is doubtful) that Lawrence saved proper ex-ceptions with respect to such of the possible violations of the rule in *Bruton* v. *United States,* 391 U. S. 123 (1968), as continue to have any vitality in view of our actions on Lawrence's motions for directed ver-dicts, we do not think any real harm was suffered. Limiting instruc-tions were given in each instance, and none of the evidence which may still be in question was particularly inculpatory. There was enough other evidence (admitted without objection or not challenged on *Bruton* grounds), much of it direct, on the points which could have been found or inferred from the evidence still in question for us to conclude (as we do) that the jury would not have found the prosecution's case against Lawrence significantly less persuasive if the evidence had been ex-cluded. See *Commonwealth* v. *Corradino,* 368 Mass. 411, 419-420 (1975), and cases cited.

C-2.  The attorney-client privilege involved in the Wilkinson testi-mony belonged to FFC, not to Lawrence. Lawrence had left the em-

Commonwealth *v.* Benjamin.

| (6) Approximate immediate amount of proceeds | (7) Count number(s) corresponding to date(s) of overt act(s) | (8) Found guilty*** | (9) Conspiracy included in first sentence term | (10) Conspiracy included in second sentence term | (11) Conspiracy included in third sentence term |
|---|---|---|---|---|---|
| $70,000 | 94,95,96, 102,103, 104,105, 106 | Be and R (all 8 counts); M (count 96) | | Be, R | |
| $15,000 | 117,119 | Be, R, L | | | Be, R, L |
| $20,000 | 120,123 | Be, M | | | Be |
| $6,000 | 121 | R | | | R |

APPENDIX C *(Cont.)*.

ploy of FFC several years prior to trial and did not appear to have any authority to invoke the privilege in FFC's behalf. Compare *Bermingham* v. *Thomas, post,* 742 (1975). In any event, the substance of much of the Wilkinson testimony was admitted against Lawrence at other points in the trial pursuant to rulings which are no longer questioned.

C-3. Our consideration of the charge as a whole (*Commonwealth* v. *Ramey,* 368 Mass. 109, 114-115 [1975]) leads us to the conclusion that it afforded adequate coverage of so much of Roberts' twenty-sixth through twenty-eighth requests for instructions as could properly have been given in the circumstances. *Commonwealth* v. *Monahan,* 349 Mass. 139, 170-171 (1965). In particular, the judge instructed, "The fundamental rule that you must follow in considering each count against each defendant is that you must confine ... [yourselves] to the evidence admitted against that defendant on that count."

C-4. There was ample evidence from which the jury could have

APPENDIX C (Cont.).

found (despite his occasional protestations to the contrary) that Brousseau's intent with respect to each of the conspiracies in which he had participated was to injure, defraud or steal. Accordingly, the fourth sentence of Roberts' thirtieth request for an instruction was properly denied because, if given, it would have "direct[ed] the attention of the jury to specific and in themselves indecisive facts." Commonwealth v. Festo, 251 Mass. 275, 283 (1925). Compare the Beneficial case, 360 Mass. at 303. The balance of that request was given in substance.

C-5.　Counsel for Roberts had admittedly not been present during the sentencing conference which the prosecution had had with other defense counsel at an earlier date, and it is clear that the proffered statements of Roberts' counsel concerning what had transpired at that conference were excluded for that reason. No exception was taken to the judge's refusal to accept the proffered statements, nor was any effort made to offer competent proof of what had transpired at the conference. Contrast Commonwealth v. Zezima, 365 Mass. 238, 240 (1974). In any event, and as the judge clearly recognized and succinctly stated, "[t]he weight of the recommendation is wholly for the [c]ourt to determine." There is nothing in North Carolina v. Pearce, 395 U. S. 711, 725-726 (1969), or in Gavin v. Commonwealth, 367 Mass. 331, 337-338 (1975), which should afford Roberts any comfort in the circumstances.

C-6.　Lawrence, who is indigent, continues to complain of the denial of his original motion for a free copy of the entire trial transcript (approximately 9,700 pages) and of the denial of his subsequent motion for a free copy of approximately 2,200 designated pages of the transcript. The judge entered an express order by which counsel for Lawrence was permitted free access to the court's copy of the transcript in the clerk's office during normal business hours and by which counsel was permitted to borrow from the clerk's office as many as six volumes at a time for consecutive periods of four days each, with the right to make handwritten or dictated abstracts. The particular circumstances under which Lawrence was permitted to prosecute his exceptions did not require the evidence to be summarized in his bill of exceptions, and the judge, at Lawrence's request, enlarged the time for filing his bill for more than a year in the aggregate. The judge found, in the order by which he denied Lawrence's second motion, that "there will be no prejudice to the defendant from any failure to have in his exclusive possession, as his own property, a copy of the transcript" and no "denial of any constitutional rights of the defendant." This court likewise provided Lawrence free access to the transcript in the clerk's office during normal business hours throughout the period of more than seven months between the entry of Lawrence's exceptions and the time when his brief was required to be filed. If there was constitutional error, we are convinced that it was harmless beyond a reasonable doubt. See such cases as those cited in Commonwealth v. Baker, 368 Mass. 58, 77 (1975).